## UNITED STATES DISTRICT COURT OF
## THE SOUTHERN DISTRICT OF FLORIDA
## WEST PALM BEACH DIVISION

| | |
|---|---|
| **JOHN STEWART, on behalf of the NextEra Energy, Inc. Employee Retirement Savings Plan, individually and as a representative of a class of participants and beneficiaries,** | |
| **Plaintiff,** | **CASE NO.:** |
| **vs.** | |
| **NEXTERA ENERGY, INC.,** | |
| **Defendant.** | |

## <u>CLASS ACTION COMPLAINT</u>

1.      This action seeks to protect the retirement savings of more than 19,000 NextEra Energy, Inc. ("NextEra") employees who are participants in the NextEra Energy, Inc. Employee Retirement Savings Plan ("Plan").

2.      NextEra has a fiduciary duty to ensure that its Plan does not charge excessive fees to Plan participants. But over the past six years, Plan participants have paid millions of dollars in excessive and unreasonable compensation to Fidelity Workspace Services, LLC ("Fidelity"), the Plan's recordkeeper.  Plan participants will continue to pay grossly excessive compensation to Fidelity unless this action moves forward.

3.      Not only that, the value of Plan participants' accounts who invested in company stock has decreased by approximately $500 million.  These fees, and astronomical retirement account losses, are tantamount to waste. And, again, Plan participants will continue to have their retirement savings wasted due to excessive investment related fees unless this action moves forward and corrected actions are taken by NextEra.

4.      John Stewart ("Plaintiff") brings this action on behalf of the Plan under 29 U.S.C. §1132(a)(2) and (3) to enforce liability under 29 U.S.C. §1109(a) and to restore to the Plan all losses resulting from NextEra's breaches of fiduciary duty.

## JURISDICTION AND VENUE

5.      This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2) and (3).

6.      This judicial District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the District in which the Plan is administered, and where at least one of the alleged breaches took place.

## ERISA

7.      The ERISA fiduciary duty of prudence is among "the highest known to the law" and requires fiduciaries to have "an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n.8

(2d Cir. 1982). As a fiduciary to the Plan, NextEra is obligated to act for the exclusive benefit of the Plan and to ensure that the Plan's expenses are reasonable. *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 333 (3d Cir. 2019). Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B).

8.     "ERISA is a remedial statute designed to protect the interests of plan participants and beneficiaries….Courts should not hasten to employ technical rules of pleading and practice to defeat that goal." *Degnan v. Publicker Industries, Inc*., 83 F.3d 27, 30 (1st Cir. 1996). This principle favors liberal construction of pleadings. *Fitzgerald v. Codex Corp*., 882 F.2d 586, 589 (1st Cir. 1989); *see also Jackson v. Truck Drivers' Union Local 42 Health & Welfare Fund*, 933 F. Supp. 1124, 1134 (D. Mass. 1996).

9.     While everyone who participates in a 401(k) plan pays fees to maintain their account, industry insiders report that over 70% of people do not believe they pay any fees. In an effort to help the public obtain a better grasp on fees they pay in retirement plans, the Department of Labor passed regulations in 2012 that require plan administrators to disclose fee and expense information to plan participants. However, most plan participants are still in the dark concerning the actual amount of fees they pay. The lack of understanding is not surprising. Often fees are hidden

from plain view. In many cases, plan providers do not make the fee and expense disclosures that the Department of Labor requires.

10.     Such is the case here. The account statements that NextEra provides to its Plan participants do not disclose the total fees and compensation paid to Fidelity by Plan participants. In addition, the Plan's Annual Form 5500 Department of Labor reports are supposed to identify the compensation paid to third parties, but as discussed below, they do not.

11.     NextEra's fiduciary obligations with respect to the Plan are especially important because Plan participants cannot negotiate fees charged to Plan participants. Plan participants must trust that NextEra will prudently do so. NextEra is also responsible for selecting investments and hiring service providers for the Plan. These fiduciary decisions have the potential to dramatically affect the amount of money that participants are able to save for retirement. According to the U.S. Department of Labor, a 1% difference in fees over the course of a 35-year career makes a difference of 28% in savings at retirement. U.S. Dep't of Labor, A Look at 401(k) Plan Fees, at 1-2 (Aug. 2013).

12.     That is, if a person placed $25,000 in a retirement account, made no other contributions to the account for 35 years, averaged a 7% return for 35 years, and paid .5% in fees, the account balance will grow to $227,000. But if the fees are increased by just 1%, the 1% increase costs a staggering $64,000, or 28% of the

retirement savings. The Plan currently has nearly $1.8 billion of assets under management. A 28% loss of $1.8 billion equals more than $50 million. These numbers underscore the importance of NextEra's ERISA fiduciary duties. Imprudence results in massive financial losses to workers forced to rely on NextEra to prudently administer the Plan.

13.    Accordingly, NextEra must engage in a rigorous process to control fees and ensure that Plan participants pay no more than a reasonable level of compensation to the Plan's service providers. This is particularly true for billion-dollar plans like the Plan here, which has the bargaining power to obtain the highest level of service and the lowest fees. The fees available to billion-dollar retirement plans are orders of magnitude lower than the much higher retail fees available to small investors.

14.    The entities that provide administrative services and investments to retirement plans have a strong incentive to maximize their fees. Each dollar in fees paid from participants' retirement savings reduce by the same amount participants' retirement savings, and participants lose the potential for those lost assets to grow over the remainder of their careers. Accordingly, participants' retirement security is directly affected by the diligence used by plan fiduciaries to control, negotiate, monitor, and reduce a plan's fees.

15.    Plan fiduciaries must be cognizant that self-interested third parties seek

to maximize fees from plans, and fiduciaries may not simply accede to demands, or agree to quotes without negotiating or considering alternatives. In order to act in the exclusive interest of a Plan and not in the service providers' interest, fiduciaries must negotiate as if their own money was at stake. However, as is often the case, and as is true here, fiduciaries like NextEra fail to do so resulting in millions of losses to Plan participants.

## THE PLAN

16.     The Plan is a qualified retirement plan commonly referred to as a 401(k) plan.

17.     The Plan is established and maintained under written documents in accordance with 29 U.S.C. §1102(a)(1).

18.     Eligible current and former employees of NextEra are eligible to participate in the Plan. The Plan provides the primary source of retirement income for many former NextEra's employees.

19.     The Plan contains employee stock ownership plan (ESOP) provisions. The ESOP component is a stock bonus plan within the meaning of U.S. Treasury Regulation Section 1.401-1(b)(1)(iii), which is qualified under Section 401(a) of the Code and is designed to invest primarily in the common stock, par value $.01 per share, of NextEra company stock.

20.     Generally speaking, defined contribution retirement plans are generally

classified as follows: "Micro" plans (<$5 million in assets); "Small" plans ($5 million-<$50 million); "Mid" plans ($50 million-<$200 million); "Large" plans ($200 million-<$1 billion); and "Mega" plans (>$1 billion).

21.    As of December 31, 2021, the Plan had $6,940,703,631 in assets and 19,582 participants with account balances.  Thus, the Plan qualifies as a "mega" plan in the 401(k) marketplace.

22.    Incredibly, nearly half of the Plan's money has been imprudently invested in company stock.  As explained below, that imprudent decision by NextEra has cost the Plan and its participants approximately $500 million in value the last two years.

23.    Additionally, as explained below, instead of leveraging the Plan's tremendous bargaining power to benefit Plan participants, NextEra caused the Plan to pay unreasonable and excessive compensation to Fidelity.

## THE PARTIES

### *Plaintiff & Standing*

24.    To the extent the Plaintiff must show individual injuries, even though §1132(a)(2) does not provide redress for individual injuries, Plaintiff has standing to bring this action on behalf of the Plan because he has participated in the Plan, suffered losses because of NextEra's imprudence, and was injured by NextEra's

unlawful conduct. Plaintiff, like all Plan participants, continues to be harmed by NextEra's ongoing fiduciary breaches.

25.     Plaintiff is a participant in the Plan under 29 U.S.C. §1002(7).

26.     Named Plaintiff John Stewart is a resident of Mississippi. He is a participant in the Plan as defined by ERISA.

27.     Plaintiff Stewart's individual retirement account was injured by NextEra's breach of fiduciary duty of prudence.

28.     To begin with, Plaintiff Stewart suffered financial harm in the form of lost money/retirement savings because of NextEra's self-serving and financially motivated decision to dump nearly half of the Plan's investments in company stock, a brazenly imprudent decision by NextEra leaving the Plan with the most money invested in the employer stock among all companies in the S&P 500 Utilities Sector. Because the value of NextEra shares have dropped more than 27% over the last two years, this imprudent investment strategy by Defendant resulted in an incredible $500 million loss for company employees, including Plaintiff and the class members here.

29.     Thus, because Plaintiff Stewart invested in company stock, he invested in a fund/holding specifically challenged by this Complaint.  Should Plaintiff prevail, the value of Plaintiff Stewart's individual retirement account would increase as a result of any Plan recovery because he is invested in a challenged fund/holding.

30.     NextEra committed a Plan-wide breach causing financial harm to Plaintiff Stewart's individual account because of the Plan's approximate 50% investment in company stock.  More specifically, NextEra's self-serving decision to bet on itself by investing half of the Plan's holdings in company stock resulted in the loss of money from his retirement account.

31.     Not only that, NextEra imprudently caused the Plan's recordkeeper, Fidelity, to receive millions of dollars of excessive recordkeeping compensation from the Plan and its participants, including Plaintiff Stewart, by causing the Plan to pay Fidelity excessive direct fee compensation, excessive float compensation, and excessive revenue sharing compensation.

32.     By of specific example and not limitation, as set out below, like all Plan participants, Plaintiff Stewart suffered financial harm in the form of lost money/retirement savings because NextEra caused him to pay $56 per year in 2021 in just direct compensation to Fidelity when other prudent fiduciaries, including those for Plan of similar size and holdings also utilizing Fidelity as recordkeeper, secured the same services for $30 or less.

33.     Plaintiff Stewart paid similarly excessive amounts in direct compensation for recordkeeping every year he invested in the Plan, when, once again, other prudent fiduciaries, including those for Plan of similar size and holdings also utilizing Fidelity as recordkeeper, secured the same services for $30 or less.

Plaintiff Stewart suffered further financial harm in the form of lost money/retirement savings because NextEra imprudently caused the Plan, and its participants, to pay indirect excessive float and revenue sharing compensation to Fidelity during the relevant time period.

34. These actions by resulted in NextEra committing an additional Plan-wide breach causing financial harm to Plaintiff Stewart's individual account, namely because he lost money/retirement savings and the opportunity to grow his retirement savings with money that instead was wasted on excessive compensation payments to Fidelity.

35. Plaintiff Stewart seeks to recover this money that should have been in his account had it not been for NextEra's fiduciary imprudence.

36. Based on the documents available to Plaintiff thus far, by adding the indirect compensation to the direct compensation paid to Fidelity, the true total compensation paid to Fidelity was easily over $150 per participant per year when it should have been $30 or less. Plaintiff Stewart's individual retirement account suffered economic losses as a result of NextEra's imprudent decision to pay excessive direct compensation, float compensation, and indirect compensation via revenue sharing to Fidelity.

37. Should Plaintiff prevail, the value of Plaintiff Stewart's individual retirement accounts would increase as a result of any Plan recovery because he paid

excessive recordkeeping compensation that would be recovered and distributed to Plan participants' individual accounts.  He would also be entitled to recover a pro-rata portion of the Plan's losses related to NextEra's ill-advised and blatantly imprudent decision to "bet the company"—on itself—when it dumped half of the Plan's $6 billion-plus holdings into company stock.

38.     In terms of ERISA standing, §1132(a)(2) allows recovery for a "plan" and does not provide a remedy for individual injuries distinct from plan injuries. Here, the Plan suffered millions of dollars in losses caused by NextEra's fiduciary breaches.

39.     The Plan continues suffering economic losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiff and the Plan. The Plan is the victim of any fiduciary breach and the recipient of any recovery. Indeed, if NextEra acted prudently, it would immediately correct the flaws identified in this Complaint to stop losses from continuing to occur to the Plan and its participants.

40.     Section 1132(a)(2) authorizes any Plan participant to sue derivatively as a representative of the Plan to seek relief on behalf of the Plan. 29 U.S.C. §1132(a)(2). As explained in detail below, the Plan suffered millions of dollars in losses caused by NextEra's fiduciary breaches and the Plan remains exposed to harm and continued losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiff.

41.     As a result of NextEra's imprudence, Plaintiff and Plan participants are entitled to restitution in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for NextEra's breaches of fiduciary duty as described herein.

### *NextEra*

42.     NextEra is a statutory fiduciary of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because: (a) it is a named fiduciary under the Plan, (b) it exercised discretionary authority and control over Plan management and/or authority or control over management or disposition of Plan assets, and (c) represents to Plan participants that it is a fiduciary of the Plan.

### CLASS ACTION ALLEGATIONS

43.     Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of themselves and the following proposed class ("Class"):

> All persons who were participants in or beneficiaries of the Plan, at any time between September 25, 2016, and the present (the "Class Period").

44.     The members of the Class are so numerous that joinder is impractical. According to the Plan's Annual Form 5500 for the year ending 2021,  filed with the U.S. Department of Labor, there were 19,582 Plan participants with account balances as of December 31, 2021.

45.     Plaintiff's claims are typical of Class members' claims. Like other Class members, Plaintiff participated in the Plan and suffered injuries because of NextEra's ERISA fiduciary breaches. NextEra treated Plaintiff consistently with other Class members and managed the Plan as a single entity. Plaintiff's claims and Class members' claims arise out of the same conduct, policies, and practices of NextEra as alleged herein, and all members of the Class have been similarly affected by NextEra's ERISA violations and will be similarly affected in the future unless remedial measures are adopted.

46.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

    A.    Whether NextEra is a fiduciary of the Plan;

    B.    Whether NextEra breached its fiduciary duty of prudence by engaging in the conduct described herein;

    C.    Whether NextEra failed to prudently monitor other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

    D.    Whether NextEra caused the Plan to pay excessive compensation to Fidelity;

    E.    Whether NextEra caused the Plan to pay excessive fees for investments;

    F.    The proper form of equitable and injunctive relief; and

    G.    The proper measure of relief.

47.     Plaintiff will fairly and adequately represent the Class and has retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiff has no interests antagonistic to those of other Class members. Plaintiff is committed to the vigorous prosecution of this action and anticipates no difficulty in the management of this action as a class action.

48.     This action may be properly certified under Fed. R. Civ. P. 23(b)(1). Class action status in this action is warranted under Fed. R. Civ. P. 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for NextEra.  Class action status is also warranted under Fed. R. Civ. P. 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

49.     In the alternative, certification under Fed. R. Civ. P. 23(b)(2) is warranted because NextEra has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## EXCESSIVE COMPENSATION PAID TO FIDELITY

50.     Plan administrative services are sometimes called recordkeeping services. The recordkeeper keeps track of the amount of each participant's investments in the various options in a plan, and typically provides each participant with a quarterly account statement. The recordkeeper often maintains a plan website or call center that participants can access to obtain information about a plan and to review their accounts. The recordkeeper may also provide access to investment education materials or investment advice. These administrative services are largely commodities, and the market for them is highly competitive.

51.     Nearly all recordkeepers in the marketplace for billon dollar plans offer the same services. The services are fungible.

52.     The market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service. By way of analogy, recordkeeping services are similar with respect to services provided by mortgage companies. In both industries the services provided by competitors are very similar and entities compete on price. As a result of such competition, recordkeepers (like mortgage companies) vigorously compete for business by offering the best price.

53.     The cost of providing recordkeeping services depends mainly on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant

recordkeeping fee. Because recordkeeping expenses are driven by the number of participants in a plan, most plans are charged on a per-participant basis.

54.     Recordkeeping expenses can be paid directly from plan assets, or indirectly by taking money from plan participants' individual accounts (or a combination of both).

55.     In a typical "direct" recordkeeping fee arrangement, the plan contracts with a recordkeeper to obtain administrative services in exchange for a flat annual fee based on the number of participants for which the recordkeeper will be providing services, for example $30.00 per year, per plan participant.

56.     A flat price based on the number of participants in the plan ensures that the amount of compensation is tied to actual services provided and does not grow based on matters that have nothing to do with actual services provided by a recordkeeper, such as an increase in plan assets due to market growth, or greater plan contributions by employees.

57.     By way of illustration, a plan with 30,000 participants and $3 billion in assets may issue a request for proposal to several recordkeepers and request that the recordkeepers provide pricing based on a flat rate for a 30,000-participant plan. If the winning recordkeeper offers to provide the recordkeeping services at a flat rate of $30.00 per participant, per year, the fiduciary would then contract with the recordkeeper for the plan to pay a $900,000 direct annual fee (30,000 participants at

$30.00 per participant). If the plan's assets double to $6 billion but the participant level remains constant, the recordkeeper's compensation remains $30.00 because it is tethered to the number of participants rather than the plan's assets.

58.     Such a flat per-participant agreement does not necessarily mean, however, that every participant in the plan must pay the same $30.00 fee from his or her account. The plan could reasonably determine that assessing the same fee to all participants would discourage participants with relatively small accounts from participating in the plan, and that, once the aggregate flat fee for the plan has been determined, a proportional asset-based charge would be best. In that case, the flat per participant rate of $30.00 per participant multiplied by the number of participants would simply be converted to an asset-based charge, such that every participant pays the same percentage of his or her account balance. For the $3 billion plan in this example, each participant would pay a direct administrative fee of 0.03% of his or her account balance annually for recordkeeping ($900,000/$3,000,000,000 = 0.0003). If plan assets increase thereafter, the percentage would be adjusted downward so that the plan is still paying the same $900,000 price that was negotiated at the plan level for services to be provided to the plan.

59.     Recordkeepers in the marketplace offer an array of other fee and expense models. These often include some combination of dollar per head and asset-based approaches. Plaintiff is specifically not alleging that NextEra was required to

use a direct payment arrangement – or any specific payment arrangement for that matter. Rather, Plaintiff is simply providing details on how direct payment methods operate and provide these details to partially illustrate (together with all the allegations herein) that the compensation Plan participants are paying to Fidelity is grossly excessive and that NextEra should have done more to investigate, monitor, request, negotiate, and secure reasonable fees for the Plan.

60.    The Plan's recordkeeper, Fidelity, receives compensation via both direct and indirect payment streams from the Plan.

61.    As disclosed in the Plan's Annual 5500 Disclosures, Fidelity received direct compensation from the Plan as follows:

| Year | Direct Compensation | Plan Participants | Per Participant |
|------|--------------------|--------------------|-----------------|
| 2021 | $1,099,201 | 19,582 | $56 |
| 2020 | $1,281,631 | 19,174 | $66 |
| 2019 | $1,166,838 | 18,987 | $61 |
| 2018 | $1,084,251 | 18,128 | $59 |
| 2017 | $1,178,024 | 18,056 | $65 |
| 2016 | $1,047,637 | 17,702 | $59 |

62.    A reasonable total amount of compensation for Fidelity's specific services provided to the Plan ought to be no more than $30 annually. As the table above shows, Fidelity received excessive direct compensation every year during the Class period. But it gets much worse.

63.    Fidelity also receives indirect compensation from the Plan for recordkeeping services. Fidelity receives indirect fees in two material ways. First, Fidelity receives compensation via "float" on Plan participant money.  Second, Fidelity receives compensation via a practice known as revenue sharing.

64.    With regard to fees via float, NextEra agreed that anytime Plan participants deposit or withdraw money from their individual accounts in the Plan that the money will first pass through a Fidelity clearing account. Plan participant money typically sits in Fidelity's clearing account for 2-3 days. NextEra also agreed Fidelity could keep the investment returns and/or any interest earned on Plan participant money while the money is in Fidelity's clearing account. This is a form of indirect compensation that Fidelity receives as the recordkeeper for the Plan. The Plan's Annual Form 5500 for the year ending 2021 shows that more than $457 million was transferred in and out of the Plan in the year 2021.  However, Fidelity has not tracked, monitored, or negotiated the amount of compensation Fidelity receives from income it earns on Plan participant money while the money is in Fidelity's clearing account.  If Fidelity earned just 1% on $457 million in 2021, then Fidelity pocketed $4.57 million in float income for 2021 alone. And Fidelity earned float income throughout the Class Period. To identify exactly what Fidelity earned in float income throughout the Class Period, Plaintiff will need to obtain that information from Empire because NextEra imprudently failed to do so and has

otherwise made no meaningful disclosures to Plan participants concerning the compensation Fidelity receives via float.

65.    NextEra breached its fiduciary duty of prudence by allowing Fidelity to receive compensation from Plan participants via float without even knowing the amount of compensation Fidelity collects from interest on participant money as to the float, and because the amount of compensation Fidelity receives via float is excessive relative to the services provided and relative to prudent options in the marketplace.

66.    The U.S. Department of Labor has provided clear and unequivocal instructions on the issue. (*See* Department of Labor, Field Assistance Bulletin No. 2002-03, dated November 5, 2002, available at https://www.dol.gov/agencies/ebsa/employers-and-advisers/guidance/field-assistance-bulletins/2002-03, last visited on September 13, 2023.) The Department of Labor instructs that float income is compensation that must be considered, negotiated, and monitored by ERISA fiduciaries, and further instructs that it is imprudent under ERISA for a plan sponsor (like NextEra here) to fail to do so.

67.    NextEra's fiduciary failure to include compensation Fidelity received from the Plan via float caused the Plan to suffer millions in losses during the Class Period. Plaintiff and all Plan participants suffered monetary losses. Had NextEra considered, monitored, tracked, and included the amount of compensation Fidelity

receives from the Plan via float, that amount would have offset the other direct and indirect compensation Plaintiff and Plan participants paid to Fidelity. Plaintiff, thus, suffered a concrete and particularized injury caused by NextEra's ERISA fiduciary breach of prudence.

68.     Fidelity also receives indirect compensation via revenue sharing. In a revenue sharing arrangement (like float), the amount of compensation for recordkeeping services to a plan is not based on the actual value of any services, instead compensation is based on the amount of assets in the plan, or amount of assets in certain investments in the plan. For example, the recordkeeper will agree to a fee that is tethered to the amount of assets in a plan. The fees will grow to unreasonable levels if plan assets grow while the number of participants, and thus the services provided, does not increase at a similar rate. By way of another example, if a recordkeeper contracts to receive one percent annually of assets in the plan as indirect compensation for a plan with 100 participants and $300,000 in plan assets, the recordkeeper would receive $3,000 per year in fees, or $30.00 on a per plan participant basis. But if the plan assets increased to $300,000,000 – and the contract remains the same, the recordkeeper receives $3,000,000 per year in fees, or $30,000 per plan participant. This would be an excessive fee by any measure.

69.     Revenue sharing (like float), while not a *per se* violation of ERISA, can lead to massively excessive fees if not properly understood, monitored, and capped.

If a fiduciary decides to use revenue sharing to pay for recordkeeping, it is required that the fiduciary (1) determine and monitor the amount of the revenue sharing and any other sources of compensation that the provider has received, (2) compare that amount to the price that would be available on a flat per-participant basis, or other fee models that are being used in the marketplace, and (3) ensure the plan pays a reasonable amount of fees.

70.     Self-interested recordkeepers prefer fee agreements that allow them to receive "direct" and "indirect" payments for recordkeeping. Recordkeepers often tout the direct fees they collect as being "reasonable" while they surreptitiously pilfer retirement savings from Plan participant via indirect fees. Such is the case here.

71.     Recordkeepers often attempt to construct their fee agreements so that their fees are not solely tied to any actual services, but to the amount of assets in a plan (*i.e.*, float and revenue sharing).  That way, as Plan assets increase, so do the recordkeepers' fees.  Plaintiff is not making a claim against NextEra merely because it allowed the Plan's recordkeeper to pocket direct and indirect fees. However, as here when indirect fees are left unchecked, they can be devastating for Plan participants.  As one commentator noted, "[A]t worst, revenue sharing (one source of indirect fees) is a way to hide fees.  Nobody sees the money change hands, and very few understand what the total investment expense pays for.  It is a way to milk large sums of money out of large plans by charging a percentage-based fee that never

goes down (when plans are ignored or taken advantage of). In some cases, employers and employees believe the plan is 'free' when it is in fact expensive." *See* Justin Pritchard, "Revenue Sharing and Invisible Fees."[1]

72.     Another commentator likened a revenue sharing fee arrangement to hiring a plumber to fix a leaky gasket but paying the plumber not on actual work provided but based on the amount of water that flows through the pipe. If asset-based fees are not monitored, the fees skyrocket as more money flows into the Plan.

73.     The excessive revenue sharing payments caused Plaintiff and Plan participants to suffer financial losses. Had NextEra prudently considered, monitored, tracked, disclosed, and negotiated the compensation Fidelity received from revenue sharing, NextEra would have been able to reduce the excessive compensation Plaintiff and Plan participants paid to Fidelity.

74.     It is well-established that plan fiduciaries have an obligation to monitor and control compensation paid to plan recordkeepers and to ensure that such compensation is reasonable. *See*, *e.g.*, *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) ("*Tussey II*") (holding that fiduciaries of a 401(k) plan "breach[] their fiduciary duties" when they "fail[] to monitor and control recordkeeping fees" incurred by the plan). Excessive compensation to recordkeepers "decrease [an

---

[1]     Available at: http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited September 22, 2023).

account's] immediate value" and "depriv[es] the participant of the prospective value of funds that would have continued to grow if not taken out in fees." *Sweda*, 923 F.3d at 328. No matter the method of payment or fee collection, the fiduciary must understand the total amount paid the recordkeeper and per-participant fees and determine whether pricing is competitive. *See Tussey II*, 746 F.3d at 336. Thus, defined contribution plan fiduciaries have an ongoing duty to ensure that the recordkeeper's fees are reasonable.

75.     Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs. First, they must closely monitor the recordkeeper compensation being paid by the plan. A prudent fiduciary tracks the recordkeeper's compensation by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and stand-alone pricing reports.

76.     Second, to make an informed evaluation as to whether a recordkeeper is receiving no more than a reasonable amount for the services provided to a plan, a prudent fiduciary must identify all fees, including direct compensation and indirect compensation to the plan's recordkeeper. To the extent that a plan's investments pay asset-based float and revenue sharing to the recordkeeper, prudent fiduciaries closely monitor the amount of the payments to ensure that the recordkeeper's total

compensation from all sources does not exceed reasonable levels and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

77.     Third, a plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by similar plans, as well as the recordkeeping rates that are available in the marketplace. This will generally include conducting a request for proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace. More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if a plan experiences an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

78.     Based on the information currently available to Plaintiff, NextEra failed to conduct meaningful requests for proposals ("RFP") at reasonable intervals too. This imprudent failure exacerbated the losses suffered by the Plan and caused the Plan to overpay for recordkeeping during the entire Class period.

79.     Fidelity has been the Plan's recordkeeper during the entirety of the Class Period.

80.     By going through a meaningful RFP process annually, or at least every three years—rather than not at all—a prudent plan fiduciary can review the level of service provided by the recordkeeper and compare fees in the marketplace to those being offered by the current recordkeeper. This also allows the plan fiduciary to negotiate with its current provider for a lower fee and/or move to a new provider to provide the same or better services for a more competitive and reasonable fee.

81.     Besides failing to engage in the RFP process, the Plan's government mandated disclosures fail to accurately disclose how much compensation Fidelity receives from the Plan. Moreover, the disclosures contain false information about Fidelity's compensation. For example, the Plan's 2021 Annual Form 5500 disclosure states Fidelity received no indirect compensation from the Plan – when Fidelity received millions of indirect compensation via float and revenue sharing. Below is a screenshot of the 2021 Annual Form 5500 disclosure.

FIDELITY INVESTMENTS INSTITUTIONAL

04-2647786

| (b)<br>Service Code(s) | (c)<br>Relationship to employer, employee organization, or person known to be a party-in-interest | (d)<br>Enter direct compensation paid by the plan. If none, enter -0-. | (e)<br>Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f)<br>Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g)<br>Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h)<br>Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 12 13 15<br>21 25 37<br>64 65 | TRUSTEE | 1099201 | Yes ☒  No ☐ | Yes ☒  No ☐ | 0 | Yes ☒  No ☐ |

82.     NextEra made similar false statements about Fidelity's compensation in the Plan's 2020 through 2016 Annual Form 5500 disclosures.

83.     Inexplicably, however, the Plan's 2016 to 2018 Annual Form 5500 disclosures state that Fidelity received indirect compensation from the Plan. But rather than identify the amount of the indirect compensation, NextEra stated the amount of such compensation was "$0" and then claims that Fidelity provided it with a "formula instead of an amount or estimated amount." The problem with this, of course, is that NextEra failed to disclose to Plaintiff or Plan participants what that alleged formula is, much less what application of that formula translates to in terms of the amount of "indirect compensation" plan participants are paying to Fidelity.

84.     NextEra's documented failures on government mandated disclosure forms to accurately disclose the amount of Fidelity's compensation shows that NextEra does not even know the amount Fidelity is compensated by the Plan.

85.     During the Class period, Fidelity received indirect compensation via revenue sharing and float but the compensation was not disclosed. The compensation that Fidelity received from the Plan was indisputably far more than NextEra disclosed causing the Plan participants to pay.

86.     Further, during the Class period the assets in the Plan increased from about $3.48 billion to more than $6 billion as participants continued investing money into their retirement accounts, while the number of plan participants increase only slightly from about 17,000 to 19,000.   Because Fidelity receives indirect compensation via float and revenue sharing, its compensation has exploded solely

because Plan assets have increased by more nearly three billion dollars during the Class period. NextEra has failed to monitor and control Fidelity's compensation as Plan assets increased. This is yet another classic example of a breach of ERISA's fiduciary duty of prudence.

87.    The compensation paid to Fidelity is far greater than recognized reasonable rates for a plan with more than $6 billion in assets. Given the growth and size of the Plan's assets during the Class period, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable and even superior to the services provided to the Plan by Fidelity.

88.    To be sure, the compensation Fidelity received from the Plan was grossly excessive relative to the specific services Fidelity provided to the Plan. The specific services Fidelity provided to the Plan here include, providing enrollment and educational materials;  validating payroll data; tracking employee eligibility and contributions; transaction processing;  preparing Annual form 5500 disclosures; verifying participant status; maintaining a website; printing and mailing account statements; and maintaining a customer service telephone line. The primary service provided by Fidelity, however, is keeping track of how much money plan participated have invested in the Plan and what Plan participants have earned or lost on such investments.

96.     The compensation Fidelity received for the specific services provided to the Plan were and remain excessive in relation to the services that the plan provided because, in fact, the services that Fidelity provided were nothing out of the ordinary, and a prudent fiduciary would have observed the excessive fees being paid to the recordkeepers and taken corrective action.

97.     Looking at recordkeeping costs for other plans of a similar size shows that the Plan was paying higher recordkeeping fees than its peers – an indication the Plan's fiduciaries failed to appreciate the prevailing circumstances surrounding recordkeeping and administration fees.

98.     The chart below compares the compensation NextEra caused its Plan to pay Fidelity with similarly-sized plans. Some of these plans used Fidelity as their recordkeeper, while others used different well-respected and well-known national recordkeepers for billion-dollar plans.

| Name of plan | Record-keeper | Participants w/ account balances | Plan assets | Recordkeeping per-participant basis[2] |
|---|---|---|---|---|
| **NextEra Energy, Inc. EmployeeRetirement Savings Plan** | **Fidelity** | **19,582** | **$6.6 billion** | **$56** |
| Nucor Corporation Profit Sharing and Retirement Savings Plan | Fidelity | 25,323 | $5.5 billion | $4.72 |
| Bloomberg L.P. 401(k) Plan | Great West Life | 16,251 | $4.5 billion | $9.20 |

---

[2] The recordkeeper costs in the chart are derived from Annual Form 5500 disclosures available at https://www.efast.dol.gov/5500search/, last visited on September 22, 2023.

| Verizon Savings & Security Plan Plan for New York and New England Associates | Fidelity | 19,197 | $6.5 billion | $16.62 |
| Kimberly-Clark 401(k) and Profit Sharing Plan | Fidelity | 16,912 | $4.9 billion | $24.00 |
| Deutsche Bank Matched Savings Plan | Fidelity | 17,707 | $4.5 billion | $27 |

89.     The comparable Plans above received at least the same services as the NextEra Plan. The NextEra Plan, however, paid Fidelity much more compensation for the same services than the plans identified above. NextEra caused the Plan to pay Fidelity excessive fees for the same services Fidelity offered for much less than the comparator plans. Plaintiff's anticipated expert witness reports will expand on the benchmarking herein and demonstrate conclusively that the Plan paid excessive and unreasonable compensation to Fidelity.

90.     As demonstrated by these benchmarks, considering that the recordkeeping services provided by Fidelity for the Plan are similar to those provided by Fidelity to prudently administered plans and by all national recordkeepers of $4 to $6 billion plans, NextEra's decision to cause the Plan and its participants to pay at least $56 and as much as $66 per year in just direct compensation to Fidelity during the Class period is both imprudent and in violation of ERISA.

91.     And this, of course, is only the direct compensation that NextEra admits to causing the Plan to pay Fidelity. In reality, based on the documents available to

Plaintiff thus far, by adding the indirect compensation to the direct compensation paid to Fidelity, the true total compensation paid to Fidelity was easily over $150 per participant per year. The Plan, due to its number of participants and assets, had the leverage to negotiate much cheaper recordkeeping costs but failed to do so, costing Plaintiff and Plan participants millions in lost retirement savings.

92.    By way of another meaningful benchmark,  Fidelity Investments ("Fidelity") is one of the nation's largest provider of recordkeeper services. As of September 2022, industry expert, Pensions & Investments, reported that Fidelity had $3.2 trillion of recordkeeping assets in 401k plans.

93.    Fidelity's own retirement plan was recently sued and Fidelity's employees alleged that Fidelity was receiving excessive compensation from its own plan participants. In that case, the "parties [] stipulated that if Fidelity were a third party negotiating this fee structure at arms-length, the value of services would range from $14-$21 per person per year over the class period, and that the recordkeeping services provided by Fidelity to this Plan are not more valuable than those received by other plans of over $1,000,000,000 in assets where Fidelity is the recordkeeper." *Moitoso et al. v. FMR, et al*., 451 F.Supp.3d 189, 214 (D. Mass. 2020).

94.    Additionally, in the *Moitoso* case Fidelity went on to stipulate as follows:

> The value of the recordkeeping services that Fidelity provided to
> the Plan in 2014 was $21 per participant; the value of the

recordkeeping services that Fidelity provided to the Plan in 2015 and 2016 was $17 per participant, per year; and the value of the recordkeeping services that Fidelity has provided to the Plan since January 1, 2017 is $14 per participant, per year. Had the Plan been a third-party plan that negotiated a fixed fee for recordkeeping services at arm's length with Fidelity, it could have obtained recordkeeping services for these amounts during these periods. The Plan did not receive any broader or more valuable recordkeeping services from Fidelity than the services received by any other Fidelity-recordkept plan with at least $1 billion in assets during the Class Period (November 18, 2014 to the present).[3]

95.     The key takeaway from this stipulation by Fidelity, which was submitted under penalty of perjury, is simple: Fidelity admitted: (a) its own plan did not offer services broader or more valuable than any of the plans it served and, more importantly, (b) the value of those services ranged from between $14 to $17 per participant annually; and (c) that a prudent fiduciary for a plan with at least $1 billion in assets could have secured Fidelity's recordkeeping services for between $14 to $17 per participant, per year. Thus, for NextEra to permit Fidelity to receive in excess of $150.00 per participant annually is both imprudent and a rank breach of its fiduciary duty.

96.     By way of another data point, in 2020, after being sued for allowing its recordkeeper to collect excessive compensation from its plan participants, the University of Chicago ERISA fiduciaries reduced annual recordkeeping fees for its

_____

[3] *Moitoso*, No. 1:18-cv-12122-WGY, ECF 138-67, ¶ 2.

plans to between $21-$44 per participant. The University of Chicago plan was similar to the Plan here with 10,118 active participants and about $3 billion in assets under management.

97.     NextEra could have and should have used the Plan's increasing size and long-standing relationship with Fidelity as bargaining power to reduce the Plan's recordkeeping costs. However, the opposite has occurred.  Instead, Fidelity's compensation has increased by millions each year as Plan assets increase without Fidelity providing any additional specific services.

98.     At a minimum, NextEra should have hired an independent consultant to meaningfully benchmark the Plan's administrative costs, or engaged in an objective, competitive process to hire a recordkeeper capable of providing the same or similar services without pocketing excessive compensation from the Plan. NextEra failed to so, and its failure to perform these basic but prudent fiduciary actions violate ERISA's requirements.

99.     In sum, given the size of the Plan's assets during the Class period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, NextEra could have obtained for the Plan recordkeeping services that were comparable to or superior to the typical services provided by Fidelity at a lower cost – even from Fidelity itself – had

NextEra acted as a prudent fiduciary would have under the circumstances. But NextEra failed to do so and, as a result, violated its fiduciary duties under ERISA.

## COMPANY STOCK LOSSES

100.   Under ERISA, each fund offered by a defined contribution plan must be prudent and, because diversification is a sub-duty of the duty of prudence, the duty to diversify applies at both the fund level and the plan level (i.e., to each individual investment offering).

101.   The duty imposed by § 1104(a)(1)(C) requires a fiduciary to discharge his duties with respect to a plan "by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so."

102.   Moreover, ERISA requires fiduciaries to investigate and review options for a retirement plan's assets, considering not only the merits of a transaction, but also the thoroughness of the investigation into the merits of that transaction.

103.   An adequate investigation of existing investments considers whether any of the plan's investments are "improvident" or if a "superior alternative investment" exists. Moreover, a fiduciary must account for changed circumstances that increase risk of loss.

104.   A fiduciary breaches its duty of prudence when it fails to properly monitor investments and remove imprudent ones.  Such is the case here.

105.   Here, NextEra breached its duty to diversify by electing to retain a substantial investment of the Plan's 401(k) assets in volatile company stock fund that continued to lose value over the last two years to the tune of $500 million in Plan losses.   NextEra also breached its duty to diversify by allowing the Plan's holdings of company stock *increase* even though the stock continued to steadily lose value over the last two years.

106.   NextEra allowed its employee Plan participants to whom it owed a fiduciary duty to purchase and hold an imprudent investment throughout the Class Period without taking action to protect them in any way.

107.   In fact, over the last two years NextEra's stock price went from approximately $93.88 per share to less than $67 per share, costing NextEra's employees many millions of dollars in retirement savings. Meanwhile, other investments in the Plan have fared far better, and NextEra stock continues to face significant losses.

108.   Below is a Stock Chart from Morningstar illustrating how poorly NextEra's stock has performed over the last two years:

**Stock Chart** NEE



109.   NextEra is directly responsible as a fiduciary for the enormous harm that its breaches of fiduciary duty caused because it knew, or should have known, its stock was likely to drop and continue dropping.  This is not merely speculation by Plaintiff.  It is because over the last two-plus years, NextEra has been embroiled in a political scandal that caused the CEO of its largest subsidiary, Florida Power and Light ("FPL"), to resign in January of 2023.  According to NextEra's Form 8-K:

> NextEra Energy, Inc. (NEE or we) and Florida Power & Light Company (FPL) are furnishing the following statement to be made by the Chairman, President and Chief Executive Officer of NEE during NEE's webcast report on its fourth-quarter and full-year 2022 financial results on the date of this report:

As a reminder, we reported last quarter that we were reviewing allegations of Florida state and federal campaign finance law violations raised in media articles and a related complaint filed in October 2022 with the Federal Election Commission. Our review of information reasonably available to us is now substantially complete. Regarding the Florida allegations, based on information in our possession, we believe that FPL would not be found liable for any of the Florida campaign finance law violations as alleged in the media articles. With respect to the FEC complaint, you may recall that it was filed by a special interest group and primarily relies on media articles to allege certain violations of the Federal Election Campaign Act by various parties, including, by implication, FPL. The FEC process is a confidential, civil administrative process, with an investigation only commencing if the FEC votes to do so, which decision likely will not occur until late this year. We plan to file our response seeking dismissal of the complaint in the next few weeks and do not believe it is appropriate for a complaint such as this to move forward. The total amount of contributions referenced in the complaint is less than $1.3 million and we do not expect that allegations of federal campaign finance law violations taken as a whole would be material to us.

111.   Shortly thereafter, NextEra's stock lost $7.31 per share, equivalent to a $15 billion loss to its market capitalization.

112.   By way of further background on this issue, local news outlets have been reporting since the end of 2021 that FPL was heavily involved in possible

illegal activities in the form of potential campaign violations.  For example, in December of 2021 the *Orlando Tribune* published an article reporting as follows:

> Top executives at utility giant Florida Power & Light worked closely with the political consultants who orchestrated a scheme to promote spoiler candidates in three key state Senate elections last year, according to documents obtained by the Orlando Sentinel.  The records show that the consultants who controlled Grow United Inc., the dark-money nonprofit at the center of the "ghost" candidate scandal, billed FPL for more than $3 million days before they began moving money through the entity.  The records also show FPL has donated more than $10 million in recent years to other dark-money nonprofits controlled by some of the same consultants — and FPL CEO and President Eric Silagy has personally coordinated with those consultants on campaign contributions made through their nonprofits.[4]

113.   The above is taken from merely one of many news stories that plagued NextEra and its stock as a direct result of activities FPL was allegedly involved in during the Class Period.  Those news stories dogged NextEra and FPL over the last two years which, in turn, caused NextEra's common stock to spiral downward.  That, in turn, cost the Plan about $500 million.

114.   The point is, NextEra knew, or should have known, that its company's stock price was headed for disaster in late 2021. Nonetheless, from 2021 through even today, NextEra continued aggressively and recklessly investing Plan assets into NextEra common stock.  Indeed, according to the Form 5500s NextEra filed with

---

[4]   *See*   https://www.orlandosentinel.com/2021/12/02/florida-power-light-execs-worked-closely-with-consultants-behind-ghost-candidate-scheme-records-reveal-special-report/ (last accessed September 22, 2023).

the Department of Labor  during the Class Period, the Plan has increased its holding in NextEra common stock from ***$424 million*** to ***more than $3 billion***.

115.   NextEra knew or should have known that investing half of the Plan's assets in company stock was imprudent during the Class Period due to the political scandals and potential campaign violations PFL was accused of being involved in.

116.   Based on its insider knowledge, NextEra was duty-bound by ERISA to prevent harm to the Plan and its participants from undisclosed information which it knew made its common stock an imprudent investment for retirement purposes.

117.   NextEra knew that the Plan was harmed with every purchase of common stock, at least following since December of 2021, and that the Plan's large holdings of NextEra common stock were at risk for a sizeable downward price correction. Defendant also knew that any scandal revelation would damage investors' confidence in NextEra, and that the damage would be worse the longer it lasted.

118.   Nevertheless, despite having this knowledge, NextEra continued to make its contributions to participant retirement accounts exclusively in NextEra stock.  In fact, pursuant to the Plan's terms, all NextEra's contributions to participant retirement accounts are in (and continue to be) in NextEra stock.

119.   Under these same circumstances, a prudent fiduciary would have diversified the form of its contributions or limited the amount of NextEra stock contributed to participant accounts.

120.   NextEra, as a high-level corporate insider with direct responsibility for NextEra's financial disclosures, could have issued truthful or corrective disclosures to Plan participants but failed to do so.

121.   As the Plan fiduciary, NextEra was required to act to prevent the ongoing present and future damage to the Plan, and not to conceal it from the Plan participants.   Once again, NextEra failed to do so.   Thus, NextEra failed to act prudently and breached its fiduciary duties to Plaintiff, the class members whom he seeks to represent and, of course, the Plan.

## FIRST CLAIM FOR RELIEF
### *Breach of Fiduciary Duty of Prudence*

122.   Plaintiff re-alleges and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

123.   As a fiduciary of the Plan, NextEra was and remains subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the Plan's fees and assets for the sole and exclusive benefit of Plan participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and

familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

124.   NextEra breached these fiduciary duties in multiple respects as discussed throughout this Complaint. NextEra failed to monitor or control the excessive compensation paid for recordkeeping services. Additionally, NextEra failed to make decisions regarding the Plan's investment lineup based solely on the merits of each investment and as to what was in the best interest of Plan participants as prudent fiduciary acting with the skill, diligence and in a like capacity (administering billion or retirement assets). Instead, NextEra selected its own common stock that was continuously losing value.

125.   As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had NextEra complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

126.   Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), NextEra is liable to restore to the Plan all losses caused by its breaches of fiduciary duties and must restore any profits resulting from such breaches. In addition, Plaintiff is entitled to equitable relief and other appropriate relief for NextEra's breaches as set forth in their Prayer for Relief.

## **PRAYER FOR RELIEF**

For these reasons, Plaintiff, on behalf of the Plan and all Plan participants, respectfully requests that the Court:

1. Find and declare that the NextEra breached its fiduciary duties as described above;

2. Find and adjudge that NextEra is personally liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duty, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

3. Determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

4. Order NextEra to provide all accountings necessary to determine the amounts NextEra must make good to the Plan under §1109(a);

5. Remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

6. Surcharge against NextEra and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

7. Reform the Plan to obtain bids for recordkeeping and to pay only reasonable recordkeeping expenses;

8.     Certify the Class, appoint the Plaintiff as class representative, and appoint his counsel as Class Counsel;

9.     Award to Plaintiff and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

10.    Order the payment of interest to the extent it is allowed by law; and

11.    Grant other equitable or remedial relief as the Court deems appropriate.

DATED this 25th day of September, 2023.

Respectfully submitted,

/s/ *Marc R. Edelman*
**MARC R. EDELMAN, ESQ.**
Fla. Bar No. 0096342
**MORGAN & MORGAN, P.A.**
201 N. Franklin Street, Suite 700
Tampa, FL 33602
Telephone 813-223-5505
Fax: 813-257-0572
Email: MEdelman@forthepeople.com

/s/ *Brandon J. Hill*
**BRANDON J. HILL**
Florida Bar Number: 37061
**LUIS A. CABASSA**
Florida Bar Number: 0053643
**AMANDA E. HEYSTEK**
Florida Bar Number: 0285020
**WENZEL FENTON CABASSA, P.A.**
1110 North Florida Ave., Suite 300
Tampa, Florida 33602
Telephone: (813) 337-7992
Facsimile: (813) 229-8712
Email: bhill@wfclaw.com

Email: lcabassa@wfclaw.com
Email: aheystek@wfclaw.com
*Attorneys for Plaintiffs*