**UNITED STATES DISTRICT COURT OF
THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION**

| | |
|---|---|
| JOHN STEWART, on behalf of the NextEra Energy, Inc., Employee Retirement Savings Plan, individually and as a representative of a class of participants and beneficiaries,<br><br>Plaintiff,<br><br>vs.<br><br>NEXTERA ENERGY, INC.,<br><br>Defendant. | CASE NO.: 9:23-cv-81314-AMC |

**FIRST AMENDED CLASS ACTION COMPLAINT**

1.      This action seeks to protect the retirement savings of more than 20,000 Nextera Energy, Inc. ("Nextera") employees who are participants in the Nextera Energy, Inc. Employee Retirement Savings Plan ("Plan").

2.      Nextera has an ERISA fiduciary duty to ensure that the Plan does pay excessive compensation to third parties who provide administrative services to the Plan. But during the relevant period (since September 25, 2017), Nextera has caused the Plan to pay millions of dollars in excessive and unreasonable compensation to Fidelity Investments Institutional ("Fidelity"), the Plan's recordkeeper. The Plan will continue to pay excessive compensation to Fidelity unless this action moves forward.

3.      Every ERISA compliant retirement plan must have a "plan document." The plan document describes a plan's terms and conditions related to the operation and administration of a plan. It tells plan participants about the benefits they are entitled to under the plan and provides mandates to be used by the plan sponsor/administrator in decision-making regarding plan

operations. A failure by plan fiduciaries to follow the written plan document terms is the most blatant breach of fiduciary duty for a court to identify and enforce.

5.      Here, Plan participants typically make pre-tax contributions each pay period to their individual Plan accounts. They are immediately vested in their contributions to their individual Plan accounts, plus actual earnings thereon. Nextera also matches, to a certain amount, contributions that Plan participants make to their individual Plan accounts. Vesting in the matching portion of participant accounts, plus actual earnings thereon, is based on years of credited service. A participant is 100% vested after a number of years of credited service, depending on certain circumstances.

6.      When a Plan participant has a break in service prior to full vesting, the participant forfeits the balance of any unvested contributions in his or her individual account.

7.      Section 5.05 of the Plan document is titled "Allocation of Forfeitures." It provides: "[f]orfeitures **shall** first be applied to restore to Participants amounts previously forfeited pursuant to Section 5.03. Any remaining forfeitures **shall** be applied to reduce Plan administrative expenses; if none, any remaining forfeitures **shall** be used to reduce Company Contributions." Plan Document at p. 34. (Emphasis added.)

8.      The Plan document controls how forfeitures are to be used by Nextera. Nextera breached its fiduciary duties to the Plan by failing to follow the terms of the Plan document with respect to forfeitures. Instead of using forfeitures, as required by the terms of the Plan document, to first reduce Plan administrative expenses and only after all Plan expenses were paid to use forfeitures then to reduce Nextera's contributions to the Plan, Nextera caused Plan participants to pay Plan administrative expenses and instead used forfeitures to reduce its contributions to the Plan. That is, Nexterra used the forfeitures to benefit itself financially and to the detriment of the

Plan and Plan participants – who had to pay administrative expenses that they would not have had to pay had they been used first to pay the administrative expenses. This breach caused at least $13,497,959 in Plan losses from 2016 to 2023.

9.      John Stewart ("Plaintiff") brings this action as a representative of the Plan against Nextera for breach of Employee Retirement Income Security Act's, 29 U.S.C. §§1001–1461 ("ERISA") fiduciary duties. Plaintiff seeks only remedies on behalf of the Plan.

## JURISDICTION AND VENUE

10.     This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2) and (3).

11.     This judicial District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the District in which the Plan is administered and where alleged fiduciary breaches took place.

## ERISA

12.     ERISA's fiduciary duties are among "the highest known to the law" and require fiduciaries to have "an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n.8 (2d Cir. 1982). As a fiduciary to the Plan, Nextera is obligated to act for the exclusive benefit of the Plan and to ensure that the Plan's expenses are reasonable. *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 333 (3d Cir. 2019). Nextera must act with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar size. 29 U.S.C. § 1104(a)(1)(B). That is a tall order here, given that Nextera is responsible for prudently protecting and growing more than $5 billion of retirement savings. A full heart and an empty head are not enough.

13. "ERISA is a remedial statute designed to protect the interests of plan participants and beneficiaries….Courts should not hasten to employ technical rules of pleading and practice to defeat that goal." *Degnan v. Publicker Industries, Inc*., 83 F.3d 27, 30 (1st Cir. 1996). This principle favors liberal construction of pleadings. *Fitzgerald v. Codex Corp*., 882 F.2d 586, 589 (1st Cir. 1989); *see also Jackson v. Truck Drivers' Union Local 42 Health & Welfare Fund*, 933 F. Supp. 1124, 1134 (D. Mass. 1996).

14. While everyone who participates in a 401(k) plan pays fees to maintain their individual plan accounts, industry insiders report that over 70% of people do not believe they pay any fees. In an effort to help the public obtain a better grasp on fees they pay in retirement plans, the Department of Labor passed regulations in 2012 that require plan administrators to disclose fee and expense information to plan participants. However, most plan participants are still in the dark concerning the actual amount of fees they pay. The lack of understanding is not surprising. Often, fees are hidden from plain view. In many cases, plan providers do not make the fee and expense disclosures that the Department of Labor requires.

15. The account statements that Nextera provides to its Plan participants do not disclose the total amount of compensation Fidelity receives for providing services to the Plan and its participants.

16. Nextera's fiduciary obligations concerning the Plan are especially important because Plan participants cannot negotiate fees charged to Plan participants. Plan participants must trust that Nextera will prudently do so. These fiduciary decisions have the potential to dramatically affect the amount of money that participants are able to save for retirement. According to the U.S. Department of Labor, a 1% difference in fees over a 35-year career makes a difference of 28% in savings at retirement. U.S. Dep't of Labor, A Look at 401(k) Plan Fees, at 1-2 (Aug. 2013).

17. That is, if a person placed $25,000 in a retirement account, made no other contributions to the account for 35 years, averaged a 7% return for 35 years, and paid .5% in fees, the account balance will grow to $227,000. But if the fees are increased by just 1%, the 1% increase costs a staggering $64,000, or 28% of the retirement savings. The Plan currently has more than $5 billion of assets under management. A 28% loss of $5 billion equals roughly $1.4 billion. These numbers underscore the importance of Nextera's ERISA fiduciary duties. Imprudence results in massive financial losses to workers saving for retirement and forced to rely on Nextera to prudently administer the Plan.

18. Accordingly, Nextera must engage in a rigorous process to defray reasonable expenses and to ensure that Plan participants pay no more than a reasonable level of compensation to the Plan's service providers. This is particularly true for billion-dollar plans like the Plan here, which has the bargaining power to obtain the highest level of service and the lowest fees. The fees available to billion-dollar retirement plans are orders of magnitude lower than the much higher retail fees available to small investors.

19. The entities that provide administrative services and retirement plans have a strong incentive to maximize their compensation. Each dollar paid from Plan participants' retirement savings reduces the plan participants' retirement savings by the same amount, and they lose the potential for those lost assets to grow over the remainder of their careers. Accordingly, Plan participants' retirement security is directly affected by the diligence used by fiduciaries to control, negotiate, monitor, and reduce compensation third-party service providers receive from the Plan and its participants.

20. Plan fiduciaries must be cognizant that self-interested third parties seek to maximize compensation from plans, and fiduciaries may not simply accede to demands or agree

to quotes without negotiating or considering alternatives. In order to act in the exclusive interest of a Plan and not in the service providers' interest, fiduciaries must negotiate as if their own money was at stake. However, as is often the case and, as is true here, fiduciaries like Nextera fail to do so, resulting in millions of losses to the Plan and its participants.

## THE PLAN

21.     The Plan is a qualified retirement plan commonly referred to as a 401(k) plan.

22.     The Plan is established and maintained under written documents in accordance with 29 U.S.C. §1102(a)(1).

23.     Generally speaking, retirement plans are generally classified as follows: "Micro" plans (<$5 million in assets); "Small" plans ($5 million-<$50 million); "Mid" plans ($50 million-<$200 million); "Large" plans ($200 million-<$1 billion); and "Mega" plans (>$1 billion).

24.     As of December 31, 2023, the Plan had $5,032,560,768 in assets and 20,961 participants with account balances. Thus, the Plan qualifies as a "mega" plan in the 401(k) marketplace.

25.     Instead of leveraging the Plan's tremendous bargaining power to benefit Plan participants, Nextera caused the Plan to pay unreasonable and excessive compensation to Fidelity.

26.     In accordance with 29 U.S.C. § 1103(a), the assets of the Plan are held in a trust fund. The Plan is funded by a combination of wage withholdings by Plan participants and contributions by Nextera that are deposited into the Plan's trust fund. Upon their deposit into the Plan's trust fund, all participant contributions and any matching contribution by Nextera become assets of the Plan.

27.     The Plan allows for combined pretax and/or Roth after-tax contributions by eligible employees up to the limit under Code Section 402(g), in whole percentages of up to 50% of their

eligible earnings, as defined by the Plan (50% Limit). In addition, eligible employees aged 50 or older who contributed the maximum annual amount allowable under the pretax and/or Roth after-tax options in the Plan have the option of contributing an additional pretax catch-up contribution or Roth catch-up contribution in accordance with Code Section 414(v). The Plan also allows for traditional after-tax contributions up to the 50% Limit. Participants may also make rollover contributions, which represent distributions from other qualified plans or individual retirement accounts.

28.     Eligible employees are automatically enrolled in Pretax Contributions unless such employees revoke or modify their Pretax Contribution election within 60 days of their date of hire or rehire. The Plan also has an automatic increase feature whereby eligible employees' deemed Pretax Contributions are increased by 1% each year up to a maximum of 10% unless the eligible employee revokes or otherwise modifies their Pretax Contribution election. Participants can elect to invest in any combination of different investment options offered under the Plan.

29.     The U.S. Department of Labor requires Nextera to file an annual Form 5500 Disclosure for the Plan. The Form 5500 Disclosure is part of ERISA's overall reporting and disclosure framework, which is intended to assure that employee benefit plans are operated and managed in accordance with certain prescribed standards and that participants and beneficiaries, as well as regulators, are provided or have access to sufficient information to protect the rights and benefits of participants and beneficiaries who participate in employee benefit plans.

30.     Nextera has filed annual Form 5500 Disclosures for the Plan during the relevant period. Nextera signs the annual Form 5500 Disclosures under penalty of perjury and with the following declaration: "I declare that I have examined this return/report, including accompanying schedules, statements, and attachments, as well as the electronic version of this return/report, and

to the best of my knowledge and belief, it is true, correct, and complete."

31. The annual Form 5500 Disclosure for the period covering the year ending 2023 (the most recent on file) provides the following sworn statement as to forfeitures:

Forfeitures

Forfeitures of nonvested employer matching contributions due to termination of employment are used to restore amounts previously forfeited. Any remaining forfeitures are applied to Plan administrative expenses or to reduce the amount of future employer matching contributions to the Plan. Forfeitures applied to administrative fees in 2023 totaled $735,066 and forfeitures used to reduce employer matching contributions in 2023 totaled $2,926,031. The balance of the forfeiture account was $298,746 and $178,330, respectively, on December 31, 2023, and 2022.

32. All of the Plan's annual Form 5500 Disclosures for the relevant period contain similar language.

33. Section 5.05 of the Plan, entitled "Allocation of Forfeitures," expressly provides that: "[f]orfeitures **shall** first be applied to restore to Participants amounts previously forfeited pursuant to Section 5.03. Any remaining forfeitures **shall** be applied to reduce Plan administrative expenses and, if none, any remaining forfeitures **shall** be used to reduce Company Contributions." Plan Document at p. 34. (Emphasis added.)

34. Nextera identifies in the Plan's annual Form 5500 Disclosures services providers who received $5,000 or more in compensation from the Plan. In 2023, Nextera identified nearly $4,000,000 in compensation paid by the Plan to third-party service providers. Nextera made similar disclosures in each of the years during the relevant period. At all relevant times, the Plan's administrative expenses exceeded the annual forfeitures.

35. Nextera admits in the Plan's annual Form 5500 Disclosures that it did not first use forfeitures to pay all Plan administrative expenses. Instead, Nextera admits it took the forfeitures (Plan assets) and used those Plan assets for its own benefit to reduce its future contributions in the

following amounts over the following years:

- 2023 – $2,926,031

- 2022 – $2,972,912

- 2021 – $2,835,593

- 2020 – $2,111,888

- 2019 – $2,121,489

- 2018 – $1,802,958

- 2017 – $1,700,000

36.     Thus, Nextera admits to having wrongfully taken for itself at least $13,497,959 of Plan assets from 2023 to 2017. Plaintiff alleges that Nextera has wrongfully taken for itself forfeitures in 2024 as well, but Nextera has yet to disclose the amount.

37.     While Nextera's taking of the forfeitures in the Plan's trust fund to reduce its contributions benefitted the Nextera, it harmed the Plan along with Plan participants, by causing participants to incur deductions from their individual accounts each quarter, yearly and/or at different time intervals to cover Plan administrative expenses that would otherwise have been covered by utilizing forfeited funds.

38.     Nextera also purports to have used some of the forfeitures to pay some Plan administrative expenses, but Nextera provides no accounting of these funds – as it is required under ERISA.

39.     Plaintiff alleges that given the specific context and circumstances prevailing at the time, Nextera acted throughout the relevant period with respect to forfeited funds that it was a violation of ERISA for Nextera to use forfeited funds for its benefit and not for the benefit of the Plan or the Plan's participants.

**THE PARTIES**

***Plaintiff & Standing***

40.     To the extent the Plaintiff must show individual injuries, even though §1132(a)(2) does not provide redress for individual injuries, Plaintiff has standing to bring this action on behalf of the Plan because they participated in the Plan, suffered losses because of Nextera's imprudence, and were injured by Nextera's unlawful conduct. All participants continue to be harmed by the ongoing inclusion of Nextera's fiduciary breaches.

41.     Plaintiff is a participant in the Plan under 29 U.S.C. §1002(7).

42.     Plaintiff is a resident of Tennessee. He is a participant in the Plan as defined by ERISA.

43.     Plaintiff's individual retirement account was injured by Nextera's breach of fiduciary duty of prudence.

44.     Plaintiff Stewart suffered financial harm in the form of lost money/retirement savings because Nextera imprudently caused the Plan's recordkeeper, Fidelity, to receive millions of dollars of excessive compensation from the Plan and Plan participants by causing the Plan to pay Fidelity excessive compensation.

45.     Plaintiff suffered financial harm in the form of lost money/retirement savings because Nextera caused him to pay $56 per year in 2021 in just direct compensation to Fidelity when other prudent fiduciaries, including those for Plans of similar size and holdings also utilizing Fidelity as recordkeeper, secured the same services for $21 or less.

46.     Plaintiff Stewart paid similarly excessive amounts in direct compensation for recordkeeping every year he had an individual account in the Plan when, once again, other prudent fiduciaries, including those for Plans of similar size and holdings also utilizing Fidelity as

recordkeeper, secured the same services for $21 or less. Plaintiff further lost the opportunity to grow his retirement savings with money that was wasted on excessive compensation payments to Fidelity instead.

47.     Additionally, Plaintiff's individual account in the Plan suffered losses because his account was assessed administrative fees (which he paid), which would not have been assessed had Nextera discharged its fiduciary duties to the Plan and first used forfeited Plan assets to pay for Plan administrative expenses and not for Nextera's benefit.

48.     Plaintiff seeks equitable relief, including restitution of money that should have been in his account had it not been for Nextera's fiduciary breaches.

49.     Should Plaintiff prevail, the value of Plaintiff's individual retirement account would increase as a result of any Plan recovery.

50.     In terms of ERISA standing, §1132(a)(2) allows recovery for a "plan" and does not provide a remedy for individual injuries distinct from plan injuries. Here, the Plan suffered millions of dollars in losses caused by Nextera's fiduciary breaches.

51.     The Plan continues suffering losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiff and the Plan. The Plan is the victim of fiduciary breaches and the recipient of any recovery. Indeed, if Nextera acted prudently, it would immediately correct the flaws identified in this pleading to stop losses from continuing to occur to the Plan and its participants.

52.     Section 1132(a)(2) authorizes any Plan participant to sue derivatively as a representative of the Plan to seek relief on behalf of the Plan. 29 U.S.C. §1132(a)(2). As explained in detail below, the Plan suffered millions of dollars in losses caused by Nextera's fiduciary

breaches and the Plan remains exposed to harm and continued losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiff.

53. As a result of Nextera's imprudence, Plaintiff and Plan participants are entitled to restitution in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Nextera's breaches of fiduciary duty as described herein.

### *Nextera*

54. Nextera is a statutory fiduciary of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because: (a) it is a named fiduciary under the Plan, (b) it exercised discretionary authority and control over Plan management and/or authority or control over management or disposition of Plan assets, and (c) represents to Plan participants that it is a fiduciary of the Plan.

### *Plaintiff Exhausted Administrative Remedies*

55. The original Complaint in this case was filed on September 25, 2023. (ECF 1.)

56. Shortly thereafter, at Nextera's insistence, and to avoid embroiling the Court in unnecessary motion practice, Plaintiff agreed to exhaust the Plan's administrative remedies before pursuing the claims in his Complaint.

57. Plaintiff agreed to file a Joint Motion to Stay this case to satisfy Nextera's insistence that Plaintiff first exhaust his administrative remedies before litigating his claims before this Court. The Motion was filed on October 19, 2023. (ECF 15.)

58. The Court granted the parties' Joint Motion to Stay on October 23, 2023. (ECF 17.)

59.     The Court also ordered the parties to file a Joint Status Report every ninety days providing the Court with status reports relating to the administrative remedies exhaustion process. (*Id.*)

60.     Plaintiff initiated the administrative exhaustion process on October 30, 2023, by providing Nextera's Employee Benefit Plans Administrative Committee (the "EBPAC") with a letter sent via U.S. Mail, Certified Mail Return Receipt Requested, detailing Plaintiff's claims and making a formal demand to settle the claims for $32 million on behalf of the Plan. Nextera made no offer to settle in return. Plaintiff also included a conformed copy of the original Complaint with the letter.

61.     On November 30, 2023, the EBPAC wrote Plaintiff's counsel the first of many delay-styled letters stating as follows:

> The Plan will review Mr. Stewart's claim (the "Claim") consistent with the Plan's claims procedures (enclosed herein) and the Department of Labor's claims procedure regulations, 29 C.F.R. 2560.503-1. According to the Plan's claims procedures, the Employee Benefit Plans Administrative Committee (the "Committee") would review the Claim at its next quarterly meeting on December 5, 2023. At this time, however, the Committee is gathering documents and information regarding the complex allegations in the Claim. Due to these special circumstances beyond the Plan's control, and to afford a full and fair review of the Claim, the Committee will extend the deadline for a decision on the Claim to no later than its third quarterly meeting following receipt of the Claim, as permitted by the Plan and the Department of Labor's claims procedure regulations. You should now expect to receive a decision on the Claim as soon as possible after the Committee meeting at which your claims is decided, and not later than 5 days after a determination is made.

62.     The November 30, 2023, delay letter from Nextera set forth the first of several "extensions" the EBPAC has granted itself during the administrative process. The only "special circumstances" supporting the delay was that "the Committee is gathering documents and information regarding the complex allegations in the Claim." However, simply "gathering

documents" cannot and does not satisfy the "special circumstances" required under ERISA for the extraordinarily long extensions Nextera continues to give itself.  *See* 29 CFR § 2560.503-1.

63.     Rather, "gathering documents" is an ordinary part of any administrative review process. If "gathering documents" constituted a special circumstance as defined by ERISA, then every ERISA claim and every appeal ever filed would automatically be subject to the same lengthy extensions Nextera is giving itself here.

64.     The resulting fallout would be untenable. People with claims for health benefits would get sicker or possibly die, waiting for the "gathering of documents" needed to decide their claims. Badly needed operations would not occur, doctors and insurers would not be paid, etc. The list of problems created by allowing the "gathering of documents" to qualify as the kind of "special circumstances" needed for an administrator to wait more than a year or longer to decide an ERISA claim for benefits would become endless. The impact on the entire healthcare system in this Circuit would be devastating.

65.     Turning back to the timeline of Plaintiff's exhaustion efforts in this case, consistent with the Court's Order staying this action pending exhaustion of the administrative remedies process, the parties filed Joint Status Reports roughly every 90 days after the stay Order was entered. The Joint Status Reports acknowledge that the administrative review process was underway in the first three filed with the Court. (ECF 19-24.)

66.     On April 26, 2024, the EBPAC denied Plaintiff's claim for administrative remedies. Indeed, the EBPAC refused to provide **any** remedies Plaintiff requested in the administrative exhaustion process. (ECF 24, ¶ 2)

67.     On July 24, 2024, Plaintiff timely appealed the EBPAC's initial decision. In the appeal, Plaintiff reiterated his allegations that Nextera breached its fiduciary duty of prudence by

causing the Plan to pay its recordkeeper millions of dollars in excessive recordkeeping compensation. Plaintiff's appeal submission also included additional facts learned in the exhaustion process about Nextera's breach of the Plan document and wrongful use of forfeited funds. (ECF 24, ¶ 3.) These facts did not add any additional claims. At all times, Plaintiff made a claim against Nexterra of breach of ERISA's fiduciary duties.

68. On September 23, 2024, the EBPAC informed Plaintiff that it was **<u>still</u>** "evaluating" his appeal of the EBPAC's initial decision and that a decision will be issued "no later" than March of 2025.

69. Compounding the delay and further illustrating Nextera's and the EBPAC's never-ending delay tactics, in that same September 23, 2024, letter, the EBPAC also informed Plaintiff it intends to treat forfeiture-related facts uncovered by Plaintiff during the administrative exhaustion process as "as an initial claim."

70. Consequently, the EBPAC stated it would not make an initial determination on the forfeiture-related facts until December 2024. That, of course, means—if Nextera and the EBPAC have their way—Plaintiff will have to wait until June of 2025 at minimum to exhaust remedies relating to the same breach of imprudence claim but with the additional facts relating to forfeitures before he can finally sue in federal court.

71. Such an extended timeline is a colossal waste of time and resources and violates ERISA, including 29 CFR § 2560.503-1.[1] Nextera's attempt to cast Plaintiff's forfeiture-related

---

[1] (1) In general. Except as provided in paragraphs (f)(2) and (f)(3) of this section, if a claim is wholly or partially denied, the plan administrator shall notify the claimant, in accordance with paragraph (g) of this section, of the plan's adverse benefit determination within a reasonable period of time, but not later than 90 days after receipt of the claim by the plan, unless the plan administrator determines that special circumstances require an extension of time for processing the claim. If the plan administrator determines that an extension of time for processing is required, written notice of the extension shall be furnished to the claimant prior to the termination of the initial 90–day period. In no event shall such extension exceed a period of 90 days from the end of such initial period. **The extension notice shall**

allegations as an "initial claim" makes it patently obvious that Nextera and the EBPAC have failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim. Not only that, again, Plaintiff has made only one claim, a single claim that Nextera breached its ERISA fiduciary duties owed to the Plan. Additional facts supporting that claim involving the forfeitures do not convert one claim into multiple claims.

72.     On December 23, 2024, the EBPAC unanimously affirmed its decision to deny the claim that Plaintiff raised on October 30, 2023. (ECF 24, ¶ 4.) The exhaustion process took nearly 14 months and resulted only in delay.

73.     Also, on December 23, 2024, the EBPAC issued a decision on the Plaintiff's forfeiture facts (not a claim). Despite the plain language of the Plan document and five months to conduct a very simple inquiry on a "black and white" issue (how forfeitures were allocated), the EBPAC denied *any* wrongdoing with respect to forfeitures.  (ECF 24, ¶ 5.)

74.     Thus, effective December 23, 2024, Plaintiff completed the Plan's applicable administrative claims procedure and exhausted the administrative process.

75.     Plaintiff acknowledges that in this Circuit, before a plaintiff may bring an ERISA action in federal court, he or she must exhaust the administrative remedies provided for in the ERISA plan for challenging the administrator's denial of benefits. However, Plaintiff has satisfied all applicable requirements.

76.     The Eleventh Circuit excuses the administrative exhaustion of ERISA claims in certain instances. *Perrino v. So. Bell Tel. & Tel. Co.*, 209 F.3d 1309, 1315 (11th Cir.2000). For

---

**indicate the special circumstances requiring an extension of time and the date by which the plan expects to render the benefit determination**. (Emphasis added.)

example, exhaustion in this Circuit is excused when "'resort[ing] to administrative remedies would be futile or the remedy inadequate,' or where a claimant is denied 'meaningful access' to the administrative review scheme in place." *Perrino*, 209 F.3d at 1316 (citation omitted) (quoting *Counts v. Amer. Gen. Life & Accident Ins. Co.*, 111 F.3d 105, 108 (11th Cir. 1997).)

77.     Additionally, the failure of an administrator to complete the final disposition of a claim in a timely manner results in a "deemed exhaustion" of the claimant's administrative remedies. *See Torres v. Pittston Co.*, 346 F.3d 1324, 1332 (11th Cir. 2003); 29 C.F.R. § 2560.503–1(l); *see also Coates v. Guardian Life Ins. Co.*, No. 8:07–cv–291–T–26TBM, 2008 WL 269133, at *2 & n. 6 (M.D. Fla. Jan. 30, 2008) ("The applicable regulations permit the claimant to pursue his remedies of filing suit if the plan administrator has neglected to timely deny the claim, characterizing the situation as a 'deemed' exhaustion of administrative remedies.").

78.     The "deemed exhausted" provision is also set forth in the Department of Labor's regulations at 29 C.F.R. § 2560.503–1(*l*) as follows:

> In the case of the failure of a plan to establish or follow claims procedures consistent with the requirements of this section, a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies under section 502(a) of the Act on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim.

79.     Subsequent to the *Perrino* decision, 29 C.F.R. § 2560.503–1(l) was amended to provide that where a plan administrator fails to follow claim procedures consistent with the requirements of ERISA, a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies under section 502(a) of ERISA on the basis that the administrator failed to provide a reasonable claims procedure that

would yield a decision on the merits of the claim within ninety (90) days. 29 C.F.R. § 2560.503–1(l).[2]

80.     Such is the case here. Nextera has failed to provide a reasonable claims procedure that would yield a decision on the claim's merits. Additionally, Nextera cannot and does not satisfy the "special circumstances" required under ERISA for the extraordinarily long and futile extensions Nextera continues to give itself.  *See* 29 CFR § 2560.503-1.

81.     Nextera is violating this Circuit's administrative exhaustion requirement to delay needlessly and otherwise prejudice Plaintiff, the Plan, and its participants.  Plaintiff is not required to "re-exhaust" his administrative remedies during this litigation for every discrete imprudent action he uncovers Nextera having made.

82.     Plaintiff's forfeiture-related facts are further evidence of Nextera's fiduciary imprudence, the single claim included in this First Amended Complaint and the original Complaint. Nothing in ERISA requires Plaintiff to exhaust his administrative remedies again before including the forfeiture-related facts set forth herein.

**CLASS ACTION ALLEGATIONS**

83.     Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of themselves and the following proposed class ("Class"):

> All persons who were participants in or beneficiaries of the Plan at any time between September 25, 2017, and the present (the "Class Period").

---

[2] (1) In general. Except as provided in paragraphs (f)(2) and (f)(3) of this section, if a claim is wholly or partially denied, the plan administrator shall notify the claimant, in accordance with paragraph (g) of this section, of the plan's adverse benefit determination within a reasonable period of time, but not later than **90 days** after receipt of the claim by the plan, unless the plan administrator determines that special circumstances require an extension of time for processing the claim. If the plan administrator determines that an extension of time for processing is required, written notice of the extension shall be furnished to the claimant prior to the termination of the initial **90–day period**. In no event shall such extension exceed a period of 90 days from the end of such initial period. **The extension notice shall indicate the special circumstances requiring an extension of time and the date by which the plan expects to render the benefit determination**.  (Emphasis added.)

84.     The Class members are so numerous that joinder is impractical. According to the Plan's annual Form 5500 for the year ending 2023, there were 20,336 plan participants with account balances as of December 31, 2023.

85.     Plaintiff's claims are typical of Class members' claims. Like other Class members, Plaintiff participated in the Plan and suffered injuries because of Nextera's ERISA fiduciary breaches. Nextera treated Plaintiff consistently with other Class members and managed the Plan as a single entity. Plaintiff's claims and Class members' claims arise out of the same conduct, policies, and practices of Nextera as alleged herein, and all members of the Class have been similarly affected by Nextera's ERISA violations and will be similarly affected in the future unless remedial measures are adopted.

86.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

A.     Whether Nextera is a fiduciary of the Plan;

B.     Whether Nextera breached its fiduciary duty of prudence by engaging in the conduct described herein;

C.     Whether Nextera caused the Plan to pay excessive compensation to Fidelity;

D.     Whether Nextera breach the Plan document by using Plan assets to offset its financial contributions to the Plan instead of using those assets to pay the administrative expenses of the Plan; and

E.     The proper measure of relief.

87.     Plaintiff will fairly and adequately represent the Class and has retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiff has no

interests antagonistic to those of other Class members. Plaintiff is committed to the vigorous prosecution of this action and anticipates no difficulty in managing this action as a class action.

88.     This action may be properly certified under Fed. R. Civ. P. 23(b)(1). Class action status in this action is warranted under Fed. R. Civ. P. 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Nextera. Class action status is also warranted under Fed. R. Civ. P. 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

89.     In the alternative, certification under Fed. R. Civ. P. 23(b)(2) is warranted because Nextera has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## EXCESSIVE COMPENSATION PAID TO FIDELITY

90.     Plan administrative services are sometimes called recordkeeping services. The recordkeeper keeps track of the amount of each participant's investments in the various options in a plan and typically provides each participant with a quarterly account statement. The recordkeeper often maintains a plan website or call center that participants can access to obtain information about a plan and to review their accounts. The recordkeeper may also provide access to investment education materials or investment advice. These administrative services are largely commodities, and their market is highly competitive.

91.     Nearly all recordkeepers in the marketplace for billion-dollar plans offer the same services. The services are fungible.

92.     The market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service. By way of analogy, recordkeeping services are similar with respect to services provided by mortgage companies. In both industries, competitors' services are very similar, and entities compete on price. As a result of such competition, recordkeepers (like mortgage companies) vigorously compete for business by offering the best price.

93.     The cost of providing recordkeeping services depends mainly on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. Because recordkeeping expenses are driven by the number of participants in a plan, most plans are charged on a per-participant basis.

94.     Recordkeeping expenses can be paid directly from plan assets or indirectly by taking money from plan participants' individual accounts (or a combination of both).

95.     In a typical "direct" recordkeeping fee arrangement, the plan contracts with a recordkeeper to obtain administrative services in exchange for a flat annual fee based on the number of participants for which the recordkeeper will be providing services, for example, $30.00 per year, per plan participant.

96.     A flat price based on the number of participants in the plan ensures that the amount of compensation is tied to actual services provided and does not grow based on matters that have nothing to do with actual services provided by a recordkeeper, such as an increase in plan assets due to market growth, or greater plan contributions by employees.

97. By way of illustration, a plan with 30,000 participants and $3 billion in assets may issue a request for proposal to several recordkeepers and request that the recordkeepers provide pricing based on a flat rate for a 30,000-participant plan. If the winning recordkeeper offers to provide the recordkeeping services at a flat rate of $30.00 per participant per year, the fiduciary would then contract with the recordkeeper for the plan to pay a $900,000 direct annual fee (30,000 participants at $30.00 per participant). If the plan's assets double and increase to $6 billion during the course of the contract but the participant level stays constant, the recordkeeper's compensation does not double like the plan assets did.

98. Such a flat per-participant agreement does not necessarily mean that every participant in the plan must pay the same $30.00 fee from his or her account. The plan could reasonably determine that assessing the same fee to all participants would discourage participants with relatively small accounts from participating in the plan, and that, once the aggregate flat fee for the plan has been determined, a proportional asset-based charge would be best. In that case, the flat per-participant rate of $30.00 per participant multiplied by the number of participants would be converted to an asset-based charge, such that every participant pays the same percentage of his or her account balance. For the $3 billion plan in this example, each participant would pay a direct administrative fee of 0.03% of his or her account balance annually for recordkeeping ($900,000/$3,000,000,000 = 0.0003). If plan assets increase thereafter, the percentage would be adjusted downward so that the plan is still paying the same $900,000 price that was negotiated at the plan level for services to be provided to the plan.

99. Recordkeepers in the marketplace offer an array of other fee and expense models. These often include some combination of dollar-per-head and asset-based approaches. Plaintiff is specifically not alleging that Nextera was required to use a direct payment arrangement – or any

specific payment arrangement for that matter. Instead, Plaintiff is simply providing details on how direct payment methods operate and providing these details to partially illustrate (together with all the allegations herein) that the compensation Plan participants are paying to Fidelity is grossly excessive and that Nextera should have done more to investigate, monitor, request, negotiate, and secure reasonable fees for the Plan.

100.    The Plan's recordkeeper, Fidelity, receives compensation via both direct and indirect payment streams from the Plan.

101.    As disclosed in the Plan's Annual 5500 Disclosures, Fidelity received direct compensation from the Plan as follows:

| Year | Direct Compensation | Plan Participants | Per Participant |
|---|---|---|---|
| 2023 | $1,227,162 | 21,879 | $56 |
| 2022 | $1,116,827 | 20,336 | $55 |
| 2021 | $1,099,201 | 19,582 | $56 |
| 2020 | $1,281,631 | 19,174 | $66 |
| 2019 | $1,166,838 | 18,987 | $61 |
| 2018 | $1,084,251 | 18,128 | $59 |
| 2017 | $1,178,024 | 18,056 | $65 |

The above amounts were calculated by dividing the total direct compensation Nextera reported in its annual 5500s the Plan paid to Fidelity by the total number of plan participants with account balances at the end of the year.

102.    A reasonable total amount of compensation for Fidelity's specific services provided to the Plan ought to be no more than $21 annually throughout the entire relevant time period. As the table above shows, Fidelity received excessive direct compensation every year during the relevant time period.

103.    During the administrative exhaustion process, Nextera produced documents showing that in 2019, Nextera negotiated Fidelity's direct recordkeeping compensation down to $47.00 per participant. This $47 amount contradicts what is reported in the Plan's Annual 5500 Disclosures.

104.    Nonetheless, even the $47 annual direct per-participant recordkeeping amount is more than double and excessive in comparison to other plans of similar participant and asset size plans pay for recordkeeping and more than double what Fidelity swore under penalty of perjury was available to the Plan.

105.    Regardless of whether the actual amount of direct compensation Nextera caused the Plan to pay Fidelity for recordkeeping during the class period was $66 per participant, or $61, or even $47, the amount was excessive.

106.    But it gets worse for Nextera. Fidelity also receives indirect compensation from the Plan for recordkeeping services. Indeed, in each of the Plan's Annual 5500 Disclosures, Nextera reported that Fidelity also receives indirect compensation from the Plan. Here is a screenshot from one of the 2021 Annual 5500 Disclosure:

FIDELITY INVESTMENTS INSTITUTIONAL

04-2647786

| (b)<br>Service Code(s) | (c)<br>Relationship to employer, employee organization, or person known to be a party-in-interest | (d)<br>Enter direct compensation paid by the plan. If none, enter -0-. | (e)<br>Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f)<br>Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g)<br>Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h)<br>Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 12 13 15<br>21 25 37<br>64 65 | TRUSTEE | 1099201 | Yes X   No ☐ | Yes X   No ☐ | 0 | Yes X   No ☐ |

107.    Fidelity receives indirect fees in two material ways. First, Fidelity receives compensation via "float" on Plan participant money. Second, Fidelity receives compensation via a practice known as revenue sharing.

108.    Regarding fees via float, Nextera agreed that anytime Plan participants deposit or withdraw money from their individual accounts in the Plan, the money will first pass through a Fidelity clearing account. Plan participant money typically sits in Fidelity's clearing account for 2-3 days, sometimes much longer. Nextera also agreed Fidelity could keep the investment returns and/or any interest earned on Plan participant money while the money is in Fidelity's clearing account. This is a form of indirect compensation that Fidelity receives as the recordkeeper for the Plan.

109.    The Plan's Annual Form 5500 for the year ending 2021 shows that more than $457 million was transferred in and out of the Plan in the year 2021 alone.  However, Nextera has not tracked, monitored, or negotiated the amount of compensation Fidelity receives from income Fidelity earns on Plan participant money while the money is in Fidelity's clearing account. If Fidelity earned just 1% on $500 million in 2021, then Fidelity pocketed $4.57 million in float income for 2021 alone. And Fidelity earned float income throughout the relevant period. To identify precisely what Fidelity earned in float income, Plaintiff must obtain that information from Fidelity because Nextera imprudently failed to do so and has otherwise made no meaningful disclosures to Plan participants concerning the compensation Fidelity receives via float. And no statements on the Plan's Annual 5500 Disclosures identify how much compensation Fidelity received via float.

110.     Nextera breached its fiduciary duty of prudence by allowing Fidelity to receive compensation from Plan participants via float without even knowing the amount of compensation

Fidelity collects from interest or returns on participant money as to the float, and because the amount of compensation Fidelity receives via float is excessive relative to the services provided and relative to prudent options in the marketplace.

111.    The U.S. Department of Labor has provided clear and unequivocal instructions on the issue. (*See* Department of Labor, Field Assistance Bulletin No. 2002-03, dated November 5, 2002, available at https://www.dol.gov/agencies/ebsa/employers-and-advisers/guidance/field-assistance-bulletins/2002-03, last visited on September 13, 2023.) The Department of Labor instructs that float income is compensation that must be considered, negotiated, and monitored by ERISA fiduciaries and further instructs that it is imprudent under ERISA for a plan sponsor (like Nextera here) to fail to do so.

112.    Nextera's fiduciary failure to include compensation Fidelity received from the Plan via float caused the Plan to suffer millions in losses. Had Nextera considered, monitored, tracked, and included the compensation Fidelity receives from the Plan via float, that amount would offset the other direct and indirect compensation Plaintiff and Plan participants paid to Fidelity. It was a breach of the fiduciary duty for Nextera to fail to do so. The Plan suffered losses caused by Nextera's ERISA fiduciary breach of prudence.

113.    Nextera failed to dispute Plaintiff's float-related allegations during the administrative claims process. Instead, it merely argued that "[t]he recordkeeping agreement, as restated in 2021, reflects the annual $47 per-participant recordkeeping fee and the requirement—in place throughout the period at issue—that any net float earnings Fidelity received be offset against the Plan's recordkeeping fees." Curiously, there was no evidence presented in the administrative review process showing Fidelity applied the float earnings in accordance with the recordkeeping agreement. It appears Fidelity pocketed the float compensation.

114.    Fidelity also receives indirect compensation via revenue sharing. In a revenue-sharing arrangement (like float), the amount of compensation for recordkeeping services to a plan is not based on the actual value of any services. Instead, compensation is based on the amount of assets in the plan or the amount of assets in certain investments in the plan. For example, the recordkeeper will agree to a fee that is tethered to the amount of assets in a plan. The fees will grow to unreasonable levels if plan assets grow while the number of participants, and thus the services provided, does not increase at a similar rate. By way of another example, if a recordkeeper contracts to receive one percent annually of assets in the plan as indirect compensation for a plan with 100 participants and $300,000 in plan assets, the recordkeeper would receive $3,000 per year in fees, or $30.00 on a per plan participant basis. But if the plan assets increase to $300,000,000 – and the contract remains the same, the recordkeeper receives $3,000,000 per year in fees, or $30,000 per plan participant. This would be an excessive fee by any measure.

115.    Revenue sharing (like float), while not a *per se* violation of ERISA, can lead to massively excessive fees if not properly understood, monitored, and capped. If a fiduciary decides to use revenue sharing to pay for recordkeeping, it is required that the fiduciary (1) determine and monitor the amount of the revenue sharing and any other sources of compensation that the provider has received, (2) compare that amount to the price that would be available on a flat per-participant basis, or other fee models that are being used in the marketplace, and (3) ensure the plan pays a reasonable amount of fees.

116.    Self-interested recordkeepers prefer fee agreements that allow them to receive "direct" and "indirect" payments for recordkeeping. Recordkeepers often tout the direct fees they collect as being "reasonable" while they surreptitiously pilfer retirement savings from Plan participants via indirect fees. Such is the case here.

117. Recordkeepers often attempt to construct their fee agreements so that their fees are not solely tied to any actual services but to the amount of assets in a plan (*i.e.*, float and revenue sharing). That way, as plan assets increase, so do the recordkeepers' fees. Plaintiff is not making a claim against Nextera merely because it allowed the Plan's recordkeeper to pocket direct and indirect fees. However, when indirect fees are left unchecked, they can be devastating for Plan participants. As one commentator noted, "[A]t worst, revenue sharing (one source of indirect fees) is a way to hide fees. Nobody sees the money change hands, and very few understand what the total investment expense pays for. It is a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of). In some cases, employers and employees believe the plan is 'free' when it is, in fact, expensive." *See* Justin Pritchard, "Revenue Sharing and Invisible Fees."[3]

118. Another commentator likened a revenue-sharing fee arrangement to hiring a plumber to fix a leaky gasket but paying the plumber not on actual work provided but based on the amount of water that flows through the pipe. If asset-based fees are not monitored, the fees skyrocket as more money flows into the Plan.

119. Revenue sharing compensation Fidelity received added to its already excessive compensation. Had Nextera prudently considered, monitored, tracked, disclosed, and negotiated the compensation Fidelity received from revenue sharing, Nextera would have been able to reduce the excessive compensation received by Fidelity.

120. It is well-established that plan fiduciaries are obligated to monitor and control compensation paid to plan recordkeepers and ensure that such compensation is reasonable. *See*,

---

[3] Available at: http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited September 22, 2023).

*e.g.*, *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) ("*Tussey II*") (holding that fiduciaries of a 401(k) plan "breach[] their fiduciary duties" when they "fail[] to monitor and control recordkeeping fees" incurred by the plan). Excessive compensation to recordkeepers "decrease [an account's] immediate value" and "depriv[es] the participant of the prospective value of funds that would have continued to grow if not taken out in fees." *Sweda*, 923 F.3d at 328. No matter the method of payment or fee collection, the fiduciary must understand the total amount paid by the recordkeeper and per-participant fees and determine whether pricing is competitive. *See Tussey II*, 746 F.3d at 336. Thus, plan fiduciaries have an ongoing duty to ensure that the recordkeeper's fees are reasonable.

121. Prudent fiduciaries implement three related processes to manage and control a plan's recordkeeping costs prudently. First, they must closely monitor the recordkeeper's compensation being paid by the plan. A prudent fiduciary tracks the recordkeeper's compensation by demanding documents summarizing and contextualizing the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and stand-alone pricing reports.

122. Second, to make an informed evaluation as to whether a recordkeeper is receiving no more than a reasonable amount for the services provided to a plan, a prudent fiduciary must identify all fees, including direct compensation and indirect compensation to the plan's recordkeeper. To the extent that a plan's investments pay asset-based float and revenue sharing to the recordkeeper, prudent fiduciaries closely monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

123. Third, a plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees paid by similar plans and the recordkeeping rates available in the marketplace. This will generally include conducting a request for proposal ("RFP") process at reasonable intervals and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace. More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if a plan experiences an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

124. Nextera failed to conduct meaningful requests for proposals ("RFP") at reasonable intervals too. This imprudent failure exacerbated the losses suffered by the Plan and caused the Plan to overpay for recordkeeping, too.

125. Fidelity has been the Plan's recordkeeper during the entirety of the relevant period.

126. By going through a meaningful RFP process annually, or at least every three years—rather than not at all—a prudent plan fiduciary can review the level of service provided by the recordkeeper and compare fees in the marketplace to those being offered by the current recordkeeper. This also allows the plan fiduciary to negotiate with its current provider for a lower fee and/or move to a new provider to provide the same or better services for a more competitive and reasonable fee.

127. Nextera's documented failures on government mandated disclosure forms to accurately disclose the amount of Fidelity's compensation show that Nextera does not even know the amount the Plan compensates Fidelity.

128. Further, assets in the Plan increased from about $4.5 billion in 2017 to nearly $7 billion in 2021. While the number of Plan participants increased only slightly from about 18,500 to 19,500 during the same period. Because Fidelity receives indirect compensation via float and revenue sharing, its compensation exploded solely because Plan assets have increased by billions of dollars during the same period. Nextera has failed to monitor and control Fidelity's compensation as Plan assets increased. This is yet another classic example of a breach of ERISA's fiduciary duty of prudence.

129. The compensation paid to Fidelity is far greater than the recognized reasonable rates for a plan with more than billions in assets. Given the growth and size of the Plan's assets during the relevant period, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable and even identical to the services provided to the Plan by Fidelity for far less money.

130. To be sure, the compensation Fidelity received from the Plan was grossly excessive relative to the specific services Fidelity provided to the Plan. The specific services Fidelity provided to the Plan here include providing enrollment and educational materials; validating payroll data; tracking employee eligibility and contributions; transaction processing;  preparing Annual form 5500 disclosures; verifying participant status; maintaining a website; printing and mailing account statements; and maintaining a customer service telephone line. The primary service Fidelity provides, however, is keeping track of how much money plan participants have invested in the Plan and what Plan participants have earned or lost on such investments.

131. The compensation Fidelity received for the specific services provided to the Plan was and remains excessive in relation to the services that the plan provided because, in fact, the

services that Fidelity provided were nothing out of the ordinary, and a prudent fiduciary would have observed the excessive fees being paid to the recordkeepers and taken corrective action.

132.    Looking at recordkeeping costs for other plans of a similar size shows that the Plan was paying higher recordkeeping fees than its peers – an indication the Plan's fiduciaries failed to appreciate the prevailing circumstances surrounding recordkeeping and administration fees.

133.    The chart below compares the compensation NextEra caused its Plan to pay Fidelity with similarly sized plans. Some of these plans used Fidelity as their recordkeeper, while others used different well-respected and well-known national recordkeepers for billion-dollar plans.

| Name of plan | Record-keeper | Participants w/ account balances | Plan assets | Recordkeeping per-participant basis |
|---|---|---|---|---|
| Relx US Salary Investment Plan | Great West | 19,009 | $476,652,000 | $25.00 |
| M&T Bank Corporation Retirement Savings Plan | T. Rowe Price | 22,545 | $490,331,000 | $22.00 |
| Ecolab Plan and ESOP | Fidelity | 20,890 | $464,902,000 | $22.00 |
| FirstEnergy Corp. Savings Plan | Fidelity | 16,397 | $357,305,000 | $22.00 |
| Cerner Corporation Foundations Retirement Plan | Fidelity | 24,811 | $504,478,000 | $20.00 |

134.    The comparable Plans above received at least the same services as the Plan here. The Plan, however, paid Fidelity much more compensation for the same recordkeeping services that the plans identified above paid. Nextera caused the Plan to pay Fidelity excessive fees for the same services Fidelity offered for much less than the comparator plans. Indeed, three of the Plans are record kept by Fidelity. Plaintiff's anticipated expert witness reports will expand on the

benchmarking herein and demonstrate conclusively that the Plan paid excessive and unreasonable compensation to Fidelity.

135.    As demonstrated by these benchmarks, considering that the recordkeeping services provided by Fidelity for the Plan are similar to those provided by Fidelity to prudently administered plans and by all national recordkeepers of billion-dollar plans, Nextera's decision to cause the Plan and its participants to pay at least $56 and as much as $66 per year in just direct compensation to Fidelity during the relevant period is both imprudent and in violation of ERISA.

136.    And this is only the direct compensation that Nextera admits to causing the Plan to pay Fidelity. In reality, based on the documents available to Plaintiff thus far, by adding indirect compensation to the direct compensation paid to Fidelity, the true total compensation paid to Fidelity was easily over $100 per participant per year. Due to its number of participants and assets, the Plan had the leverage to negotiate much cheaper recordkeeping costs but failed to do so, costing Plaintiff and the Plan millions in lost retirement savings.

137.    Fidelity's own retirement plan was recently sued wherein Fidelity's employees alleged that Fidelity was receiving excessive compensation from its own plan participants for recordkeeping services. In that case, Fidelity stipulated, under penalty of perjury, "that if Fidelity were a third party negotiating this fee structure at arms-length, the value of services would range from $14-$21 per person per year over the class period, and that the recordkeeping services provided by Fidelity to this Plan are not more valuable than those received by other plans of over $1,000,000,000 in assets where Fidelity is the recordkeeper." *Moitoso et al. v. FMR, et al.*, 451 F.Supp.3d 189, 214 (D. Mass. 2020).

138.    Additionally, in the *Moitoso* case, Fidelity went on to stipulate as follows:

The value of the recordkeeping services that Fidelity provided to the Plan
in 2014 was $21 per participant; the value of the recordkeeping services that

Fidelity provided to the Plan in 2015 and 2016 was $17 per participant per year; and the value of the recordkeeping services that Fidelity has provided to the Plan since January 1, 2017, is $14 per participant, per year. Had the Plan been a third-party plan that negotiated a fixed fee for recordkeeping services at arm's length with Fidelity, it could have obtained recordkeeping services for these amounts during these periods. The Plan did not receive any broader or more valuable recordkeeping services from Fidelity than the services received by any other Fidelity-record kept plan with at least $1 billion in assets during the Class Period (November 18, 2014, to the present).[4]

139.    The key takeaway from this stipulation by Fidelity, which, again, was submitted under penalty of perjury, is simple: Fidelity admitted: (a) its own plan did not offer services broader or more valuable than any of the plans it served and, more importantly, (b) the value of those services ranged from between $14 to $21 per participant annually; and (c) that a prudent fiduciary for a plan with at least $1 billion in assets could have secured Fidelity's recordkeeping services for between $14 to $21 per participant, per year. Thus, for Nextera to permit Fidelity to receive in excess of $100.00 per participant annually is both imprudent and a rank breach of its fiduciary duty.

140.    Nextera could have and should have used the Plan's increasing size and long-standing relationship with Fidelity as bargaining power to reduce the Plan's recordkeeping costs. However, the opposite has occurred. Instead, Fidelity's compensation has increased yearly as Plan assets increase without Fidelity providing additional specific services.

141.    At a minimum, Nextera should have, but failed, to hire an independent consultant to meaningfully benchmark the Plan's administrative costs or engage in an objective, competitive process to hire a recordkeeper who would provide the same or similar services without pocketing

---

[4] *Moitoso*, No. 1:18-cv-12122-WGY, ECF 138-67, ¶ 2.

excessive compensation from the Plan. Nextera's failure to perform these basic but prudent fiduciary actions constitutes a clear violation of ERISA.

142. In sum, given the size of the Plan's assets during the relevant period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, Nextera could have obtained for the Plan recordkeeping services that were comparable to or superior to the typical services provided by Fidelity at a lower cost – even from Fidelity itself – had Nextera acted as a prudent fiduciary would have under the circumstances. However, Nextera failed to do so and, as a result, violated its fiduciary duties under ERISA.

### CLAIM FOR RELIEF
### *Breach of Fiduciary Duty of Prudence*

143. Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

144. As a fiduciary of the Plan, Nextera was and remains subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the Plan's fees and assets for the sole and exclusive benefit of Plan participants and beneficiaries and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

145. As discussed throughout this Complaint, Nextera breached these fiduciary duties in multiple respects. Nextera failed to monitor or control the excessive compensation paid for recordkeeping services. Additionally, Nextera failed to follow the Plan document and misused forfeitures to the detriment of the Plan.

146. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment

returns. Had Nextera complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

147.    Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Nextera is liable to restore to the Plan all losses caused by its breaches of fiduciary duties and must restore any profits resulting from such breaches. In addition, Plaintiff is entitled to equitable relief and other appropriate relief for Nextera's breaches as set forth in their Prayer for Relief.

## PRAYER FOR RELIEF

For these reasons, Plaintiff, on behalf of the Plan and all Plan participants, respectfully requests that the Court:

1.    Find and declare that Nextera breached its fiduciary duties as described above;

2.    Find and adjudge that Nextera is personally liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duty and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

3.    Determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

4.    Order Nextera to provide all accountings necessary to determine the amounts Nextera must make good to the Plan under §1109(a);

5.    Remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

6.    Surcharge against Nextera and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive, and/or in violation of ERISA;

7.      Reform the Plan to obtain bids for recordkeeping and to pay only reasonable recordkeeping expenses;

8.      Certify the Class, appoint the Plaintiff as class representative, and appoint his counsel as Class Counsel;

9.      Award to Plaintiff and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

10.     Order the payment of interest to the extent it is allowed by law; and

11.     Grant other equitable or remedial relief as the Court deems appropriate.

DATED this 19th day of February 2025.

Respectfully submitted,


/s/ Brandon J. Hill
**BRANDON J. HILL**
Florida Bar Number: 37061
**LUIS A. CABASSA**
Florida Bar Number: 0053643
**AMANDA E. HEYSTEK**
Florida Bar Number: 0285020
**WENZEL FENTON CABASSA, P.A.**
1110 North Florida Ave., Suite 300
Tampa, Florida 33602
Telephone: (813) 337-7992
Facsimile: (813) 229-8712
Email: bhill@wfclaw.com
Email: lcabassa@wfclaw.com
Email: aheystek@wfclaw.com

**MARC R. EDELMAN**
Florida Bar Number: 0096342
**MORGAN & MORGAN, P.A.**
201 North Franklin Street, Suite 700
Tampa, Florida 33602
Telephone: (813) 577-4722
Facsimile: (813) 257-0572
Email: medelman@forthepeople.com
*Attorneys for Plaintiffs and the Class*

- 38 -

## CERTIFICATE OF SERVICE

I **HEREBY CERTIFY** that on this 19th day of February 2025, the foregoing was electronically filed with the Clerk of the Court via the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ Brandon J. Hill
**BRANDON J. HILL**