UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. 23-81314-CIV-CANNON

**JOHN STEWART**
*on behalf of the NextEra*
*Energy, Inc. Employee Retirement Savings*
*Plan, individually and as a representative of a*
*class of participants and beneficiaries*,

      Plaintiff,
v.

**NEXTERA ENERGY, INC.**,

      Defendant.

_____/

## ORDER DENYING DEFENDANT'S MOTION TO DISMISS

**THIS CAUSE** comes before the Court upon Defendant's 12(b)(6) Motion to Dismiss Plaintiff's First Amended Complaint (the "Motion") [ECF No. 32]. The Court has reviewed Plaintiff's First Amended Complaint (the "Complaint") [ECF No. 27], the Motion, Plaintiff's Opposition [ECF No. 34], Defendant's Reply [ECF No. 37], the parties' competing supplemental briefing [ECF Nos. 40, 45–47, 49, 50], and the full record. The Court also heard argument on the Motion at a hearing on May 20, 2025 [ECF Nos. 42, 43 (transcript)]. Following careful review, for the reasons set forth below, the Motion is **DENIED**. A separate order denying without prejudice Defendant's Motion for Sanctions is entered contemporaneously with this Order [ECF No. 53].

CASE NO. 23-81314-CIV-CANNON

## BACKGROUND[1]

This is an action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 88 Stat. 829, as amended, 29 U.S.C. § 1001 *et seq*. Under that statute, qualifying plan fiduciaries must discharge their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). Plaintiff, who made contributions to a retirement plan established by his employer, alleges a breach of those duties here, claiming that Nextera Energy, Inc. ("Nextera") breached its duty of prudence through mismanagement of the plan's funds.

Plaintiff participated in the Nextera Energy, Inc. Employee Retirement Savings Plan (the "Plan"), a qualified retirement plan that is commonly referred to as a 401(k) plan [ECF No. 27 ¶¶ 1, 21, 41]. The Plan is funded by a combination of employee wage withholdings and employer contributions by Nextera [ECF No. 27 ¶ 26]. The Plan is administered by Defendant via Nextera's Employee Benefit Plans Administrative Committee (the "Committee") in accordance with the Plan Document [ECF No. 27 ¶¶ 3–8, 60; ECF No. 32-2 (the Plan Document); *see* 29 U.S.C. § 1102 (a)(1) (requiring that all ERISA plans be established and maintained pursuant to a written instrument)].[2] The Plan Document describes the Plan's terms and conditions, informs participants about their benefits, and sets forth certain rules and procedures for how the Plan is to be administered [ECF No. 27 ¶ 3]. Defendant is a named fiduciary under the Plan and exercises

---

[1] This background is drawn from the well-pled allegations in Plaintiff's Complaint, which are accepted as true for purposes of this Order [ECF No. 27].

[2] Though not attached to the Complaint, the Plan Document, which is attached in authentic form to the Motion and central to the parties' arguments, is properly considered under the incorporation-by-reference doctrine. *See Johnson v. City of Atlanta*, 107 F.4th 1292, 1300 (11th Cir. 2024).

discretionary authority and control over Plan assets [ECF No. 27 ¶ 54]. As of December 2023, the Plan had over 20,000 participants and over $5 billion in assets [ECF No. 27 ¶ 24].

Plaintiff, suing on behalf of the Plan and as a representative of other Plan participants, alleges that Defendant mismanaged the Plan's assets between September 25, 2017, and February 19, 2025 (the "Class Period"), and, in so doing, violated its fiduciary duty of prudence under ERISA [ECF No. 27 ¶¶ 1, 9, 83, 143–147]. The one-count Complaint alleges that Defendant breached that duty in two ways: first, by failing to monitor and control the Plan's recordkeeping costs, and second, by failing to follow the Plan Document by misusing forfeitures to the detriment of the Plan [ECF No. 27 ¶ 145].[3]

In September 2023, Plaintiff filed the original complaint [ECF No. 1]. Less than a month later, the parties moved jointly to stay this action so that Plaintiff could pursue his administrative remedies under the Plan [ECF No. 15]. The Court granted that motion, after which Plaintiff initiated a claim with the Committee exercising discretionary authority to decide all claims relating to the Plan [ECF No. 17; ECF No. 27 ¶ 60; ECF No. 48-1]. A lengthy administrative process followed [ECF No 27 ¶¶ 60–73], culminating in the Committee's denial of all of Plaintiff's claims [ECF Nos. 32-9, 48-1]. Plaintiff now proceeds on an Amended Class Action Complaint [ECF No. 27], which Defendant moves to dismiss with prejudice in its entirety under Rule 12(b)(6) [ECF No. 32]. The Motion is ripe for adjudication [ECF Nos. 34, 37].

---

[3] As further discussed below, when a Plan participant has a break in service prior to full vesting, the participant forfeits the balance of any unvested contributions in his or her individual account; that is, there is a "forfeiture" [ECF No. 27 ¶ 6]. The Plan Document controls how forfeitures are to be used by Nextera [ECF No. 27 ¶ 8].

## LEGAL STANDARD

Rule 8(a)(2) requires complaints to provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To avoid dismissal under Rule 12(b)(6), a complaint must allege facts that, if accepted as true, "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see* Fed. R. Civ. P. 12(b)(6). A claim for relief is plausible if the complaint contains factual allegations that allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 545). Conclusory allegations, unwarranted deductions of facts, or legal conclusions masquerading as facts will not prevent dismissal. *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002).

## DISCUSSION

Plaintiff alleges that Defendant breached its duty of prudence in two ways. First, Plaintiff charges Defendant with failing to monitor and control the Plan's recordkeeping costs. Second, Plaintiff contends that Defendant failed to follow the Plan Document and misused forfeitures to the detriment of the Plan [ECF No. 27 ¶ 145]. The Court addresses both of Plaintiff's theories, along with Defendant's corresponding arguments, in turn.[4]

---

[4] The Motion also argues that Plaintiff has failed to exhaust his administrative remedies [ECF No. 32 pp. 24–27]. As a result of that argument, in May 2025, the Court decided to defer ruling on the Motion to permit the Committee to finalize its impending decision on Plaintiff's appeal [ECF No. 44]. In June 2025, the Committee issued its decision denying Plaintiff's appeal, acknowledging in that decision that Plaintiff fully exhausted his administrative remedies [ECF No. 48-1 p. 12]. Defendant's request to dismiss for failure to exhaustion is therefore denied as moot.

### I.     Recordkeeping Costs

Plaintiff alleges that the Plan's excessive recordkeeping fees raise a plausible breach of duty of prudence claim [ECF No. 27 ¶¶ 90–142]. "Recordkeepers help plans track the balances of individual accounts, provide regular account statements, and offer informational and accessibility services to participants." *Hughes v. Nw. Univ.*, 595 U.S. 170, 174 (2022); *see* ECF No. 27 ¶ 90. Here, the Plan's recordkeeper, Fidelity, is compensated for providing the Plan with recordkeeping services via both direct and indirect payment streams from the Plan [ECF No. 27 ¶ 100]. First there are direct fees, which are flat annual fees based on the number of participants for which the recordkeeper will be providing services—for example, $30.00 per year, per plan participant, for a plan with 30,000 participants, would pay $900,000 in direct annual fees [ECF No. 27 ¶¶ 95–97]. Plaintiff also alleges that the Plan compensates Fidelity via indirect streams, specifically via "float" and through revenue sharing [ECF No. 27 ¶ 107].[5][6]

The Court begins by looking just at Plaintiff's allegations regarding the direct recordkeeping fees paid to Fidelity. To state a claim for a breach of duty of prudence claim based on excessive recordkeeping fees, "plaintiffs [are] required to plausibly allege that [the defendant's] failure to obtain comparable recordkeeping services at a substantially lesser rate was outside the range of reasonable actions that the [defendant] could take as plan fiduciary." *Hughes v. Nw.*

---

[5] Regarding "float," the Complaint alleges that "Nextera agreed that anytime Plan participants deposit or withdraw money from their individual accounts in the Plan, the money will first pass through a Fidelity clearing account. Plan participant money typically sits in Fidelity's clearing account for 2-3 days, sometimes much longer. Nextera also agreed Fidelity could keep the investment returns and/or any interest earned on Plan participant money while the money is in Fidelity's clearing account" [ECF No. 27 ¶ 108].

[6] As for revenue sharing, according to the Complaint, "[i]n a revenue-sharing arrangement (like float), the amount of compensation for recordkeeping services to a plan is not based on the actual value of any services. Instead, compensation is based on the amount of assets in the plan or the amount of assets in certain investments in the plan" [ECF No. 27 ¶ 114].

*Univ.*, 63 F.4th 615, 633 (7th Cir. 2023) (applying *Hughes*, 595 U.S. at 177). "Thus, for this claim to survive dismissal, [] Plaintiff[] must have 'pleaded sufficient facts to render it plausible that [Defendant] incurred unreasonable recordkeeping fees and failed to take actions that would have reduced such fees.'" *Perkins v. United Surgical Partners Int'l, Inc.*, No. 23-10375, 2024 WL 1574342, at *4 (5th Cir. Apr. 11, 2024) (quoting *Hughes*, 63 F.4th at 631).

The Complaint alleges that the market for recordkeeping services for billion-dollar plans is "highly competitive, with many vendors equally capable of providing a high-level service[,]" and that "[t]he cost of providing recordkeeping services depends mainly on the number of participants in a plan" [ECF No. 27 ¶¶ 92–93]. "In general, as the number of participants in a plan increases, the per-participant cost for recordkeeping services decreases." *Perkins*, 2024 WL 1574342, at *4; *see* ECF No. 27 ¶ 93. Thus, Plaintiff charges that, "given the size of the Plan's assets during the relevant period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, Nextera could have obtained for the Plan recordkeeping services that were comparable to or superior to the typical services provided by Fidelity at a lower cost" [ECF No. 27 ¶ 142].

In support of Plaintiff's claim regarding excessive recordkeeping fees, Plaintiff offers five other plans with a similar number of participants to the Plan that paid significantly less while receiving at least the same recordkeeping services provided by Fidelity to the Plan [ECF No. 27 ¶¶ 133, 134]. Specifically, the five plans (including three plans that too use Fidelity) each have between 16,000 and 25,000 participants, and at least $350,000,000 in plan assets [ECF No. 27 ¶ 133]. These plans paid between $20 and $25 per plan participant for recordkeeping services

6

[ECF No. 27 ¶ 133].[7] The Plan in this case, however, from 2017 to 2023, with between 18,000 and 22,000 participants, paid between $47 and $65—allegedly for the same services received by the five comparator plans [ECF No. 101, 103, 132–135].[8] Under this accounting, Plaintiff alleges that the Plan paid significantly more than other plans for the same services. Plaintiff also alleges that Defendant could have taken certain steps to mitigate the Plan's recordkeeping costs, for example, by conducting a request for proposal to solicit competitive bids or hiring an independent consultant to meaningfully benchmark the Plan's administrative costs [ECF No. 27 ¶¶ 124, 141]. But Defendant failed to do so.

Accepting these allegations as true—and drawing all reasonable inferences in Plaintiff's favor as the Court must do at this stage—the Court concludes that it is at least plausible that Defendant incurred unreasonable recordkeeping fees and failed to take actions that would have reduced such fees. Accordingly, without expressing any view on the ultimate merit of Plaintiff's recordkeeping allegations, dismissal of that breach theory of liability is inappropriate. *See Perkins*, 2024 WL 1574342, at *4 (collecting cases with similar allegations where courts have declined to dismiss a duty of prudence claim).

---

[7] The Complaint does not specify the year for these figures, but because Plaintiff alleges that these figures are meant to "compare[] the compensation NextEra caused its Plan to pay Fidelity with similarly sized plans," the Court draws the plausible inference that these figures represent a period within the Class Period [ECF No. 27 ¶ 133]. Defendant does not suggest otherwise.

[8] The Complaint alleges that the Plan paid between $56 and $65 per participant in direct fees but acknowledges that Defendant maintains the actual figure for 2019 is $47 [ECF No. 27 ¶ 101–105]. Defendant embraces the $47 figure for 2021 and takes issue with how Plaintiff calculated the $56 to $65 range [ECF No. 32 p. 10]. Defendant says that Plaintiff's figures erroneously include "such *supplemental* services as loans and other add-on services" [ECF No. 32 p. 10 n.3 (emphasis in original)]. Whether this is even a meaningful distinction is unclear. *See Perkins*, 2024 WL 1574342, at *4 n.6 (noting allegation that loan processing services are negligible and often waived). In any case, at least at this stage, the Court's analysis does not hinge on whether the actual figure is $47 versus $56. If anything, the lack of clarity on this issue further demonstrates that dismissal is not the proper course.

Defendant's counterarguments, at least today at the pleading stage, are unpersuasive. Defendant insists that Plaintiff has not stated a plausible breach of prudence claim because, according to Defendant, the "Complaint includes no allegations that the five proffered plans are comparable to the Plan, that they received the same services, or that they have the same features as the NextEra Plan" [ECF No. 32 p. 17]. Because Plaintiff has failed to allege an "apples-to-apples" comparison, Defendant says, there can be no inference of imprudence [ECF No. 32 pp. 17–21 (quoting *Singh v. Deloitte LLP*, 123 F.4th 88, 95 (2d Cir. 2024)].

The Court disagrees with Defendant's assessment of the Complaint. Contrary to Defendant's suggestions, the Complaint does include allegations of the specific services Fidelity provided to the Plan; services including:

> providing enrollment and educational materials; validating payroll data; tracking employee eligibility and contributions; transaction processing; preparing Annual form 5500 disclosures; verifying participant status; maintaining a website; printing and mailing account statements; and maintaining a customer service telephone line. The primary service Fidelity provides, however, is keeping track of how much money plan participants have invested in the Plan and what Plan participants have earned or lost on such investments.

[ECF No. 27 ¶ 130]. The Complaint also includes five other plans, similar in size to the Plan, and alleges that they "*received at least the same services as the Plan here*" but at roughly half the price [ECF No. 27 ¶¶ 133–134 (emphasis added)]. While that allegation could be more thorough, the Court still must accept it as true, particularly in light of the other allegations in the Complaint. At least on this record, therefore, and in the absence of any controlling authority requiring heightened pleading in ERISA recordkeeping cases, the Court concludes that Plaintiff's allegations regarding the recordkeeping services received by the Plan and Plaintiff's five proffered comparators are sufficient to nudge the inference of imprudence from possible to plausible, and thus survive dismissal. *Cf. Caterpillar Fin. Servs. Corp. v. Venequip Mach. Sales Corp.*, --- F.4th ----, No. 23-

14237, 2025 WL 2253935, at *4 (11th Cir. Aug. 7, 2025) (emphasizing that heightened pleading of specifics or particulars is not required under Rule 8(a)(2)).

In reaching this decision, the Court draws guidance from the Fifth Circuit's unpublished, persuasive decision in *Perkins v. United Surgical Partners Int'l, Inc.*, No. 23-10375, 2024 WL 1574342 (5th Cir. Apr. 11, 2024).[9] *Perkins* also involved an alleged breach of the duty of prudence due to excessive recordkeeping costs, and like here, the defendant argued that the plaintiff "failed to allege facts necessary to conduct a like-for-like comparison with other plans" that allegedly paid less in fees. *Id*. at *5. The district court agreed and dismissed the claim with prejudice. *Id*. at *1. The Fifth Circuit reversed, distinguishing cases where a plaintiff "compared recordkeeping costs for their plan to industry-wide averages or failed to compare their plans with similarly sized plans or did not offer a comparison between plans offering similar recordkeeping services." *Id.* at *5 (collecting cases). The Fifth Circuit explained that, "although the Plaintiffs point to industry-wide averages, they also compare the Plan's recordkeeping costs with the costs for similar recordkeeping services provided to a similar number of plan participants." *Id*. at *5.[10] Ultimately, adhering to the basic pleading requirements stemming from Rule 8(a) and *Twombly*, 550 U.S. at 570, the court concluded that the allegations regarding comparative costs and services stated a plausible breach of prudence claim. *Id.*

---

[9] The Eleventh Circuit has not issued a post-*Hughes* decision on what is required to state a claim for breach of the duty of prudence based on recordkeeping fees. But no authority has been provided suggesting that the Eleventh Circuit would do anything other than apply the standard requirements of Rule 8(a) and *Twombly* to this setting, without imposing heightened fact pleading requirements. *Cf. Caterpillar Fin. Servs. Corp.*, 2025 WL 2253935, at *4.

[10] Specifically, the plaintiff in *Perkins* alleged that, "[i]n 2019, [the comparator] plans' participants ranged from 10,072 to 18,674, and their individual record-keeping costs lay between $22 to $38. Similarly, between 2015 and 2018, the Plan had as few as 11,855 and up to 16,605 participants. Yet on average, the Plan paid about $83 per participant for these services, and specific amounts that ranged from $98.35 in 2018 down to $71.28 in 2016." *Id.* at *4.

As in *Perkins*, the allegations presented in this case regarding excessive recordkeeping fees are sufficient to survive dismissal. The Complaint describes the services that the recordkeeper (here, Fidelity) provides to the Plan [ECF No. 27 ¶ 130]. The Complaint then contains a chart—similar to that deployed in *Perkins*—which "compare[s] the Plan's recordkeeping costs with the costs for similar recordkeeping services provided to a similar number of plan participants." 2024 WL 1574342, at *5; ECF No. 27 ¶¶ 101, 130–134. Unsurprisingly, Defendant objects to the conclusion that the five comparator plans offer similar services to those offered by the Plan [*see* ECF No. 32 p. 20]. But the Court must accept plausible allegations as true at this stage, and Plaintiff has offered sufficient plausible allegations here, for the reasons stated above, including his allegation that the five comparator plans receive "at least the same services as the Plan[]" [ECF No. 27 ¶ 134]. To the extent Defendant takes the position that dismissal is warranted because the Complaint does not explicitly itemize every service that is offered by each of the five comparator plans [ECF No. 27 ¶ 134], the Court disagrees. Plausibility—not heightened pleading of specific facts—is all that is required, albeit with sufficient factual matter accepted as true, as is the case here. *See Twombly*, 550 U.S. at 570; *Hughes*, 63 F.4th at 117 (vacating dismissal of duty of prudence claim with instructions to "apply[] the pleading standard discussed in [*Iqbal* and *Twombly*]"). And while Defendant may cast Plaintiff's allegation of similar services as a "bald statement" or a "conclusory allegation," the Court also disagrees; this is not a case where plaintiff simply declares that recordkeeping fees exceed a plaintiff's say-so amount or where plaintiff relies merely on "generic allegations about similar services across the industry." *England v. DENSO Int'l Am. Inc.*, 136 F.4th 632, 638 (6th Cir. 2025). Rather, Plaintiff has offered details as to the recordkeeping services provided to the Plan, named five specific, similarly-sized plans, and alleged that those five comparators receive not just "similar services"—but at least the "same services as

the Plan[]" [ECF No. 27 ¶134]. Perhaps discovery will reveal that the Plan receives services that are far superior to those provided to the five comparator plans, but given the allegations in the Complaint, the Court cannot dismiss the claim as conclusory.

In the final analysis, Plaintiff's allegations, accepted as true, plausibly allege that Defendant breached its duty of prudence by paying excessive direct recordkeeping fees.[11] And given that conclusion, at least today, the Court need not address Plaintiff's allegations of indirect compensation paid to Fidelity (float and revenue sharing).[12] [13]

---

[11] In its supplemental papers, Defendant attempts unpersuasively to cast the *Perkins* allegations as far more detailed than Plaintiff's allegations here [ECF Nos. 45, 47]. Specifically, Defendant says the *Perkins* complaint contained the following detail that is supposedly missing here: "(i) a particularized list of recordkeeping services; (ii) discussion of Form 5500 service codes; (iii) comparator plans with the same service codes as the challenged plan; and (iv) industry surveys of fees" [ECF No. 45 (citing the *Perkins* complaint)]. Upon close inspection, Defendant's attempt to distinguish *Perkins* fails. For starters, as set forth above, though not in a list form, the Complaint includes specific allegations as to the services offered by Fidelity [ECF No. 27 ¶ 130]. Also like in *Perkins*, the Complaint here includes similarly sized comparator plans allegedly paying significantly less for the same services [ECF No. 27 ¶¶ 133–134]. As for service codes, the *Perkins* court mentions the codes once in a footnote to give context to the allegations, but nothing in the decision appears to rely on that factual detail as key to the holding. *Perkins*, 2024 WL 1574342, at *4 n.6. And as for industry surveys, the *Perkins* court didn't place stock in the use of such surveys at all. *Id.* at *5. All things considered, the Court is not persuaded by Defendant's efforts to distinguish *Perkins*, which continues to provide persuasive guidance here and properly declines to impose a heightened pleading standard on plaintiffs in this context.

[12] The Plan's 2021 Annual 5500 Disclosure indicates that Fidelity also receives indirect compensation [ECF No. 27 ¶ 106; ECF No. 32-3 p. 7]. On the basis of that information, Plaintiff argues that Defendant's lower $47 figure does not capture all of the compensation paid to Fidelity [ECF No. 27 ¶¶ 106, 135–136]. The form and extent of this indirect compensation remains unclear on the current record.

[13] Plaintiff's float allegations are the subject of Defendant's Motion for Rule 11 Sanctions [ECF No. 53], which is denied without prejudice by separate order and therefore not addressed further here.

## II. Allocation of Forfeitures

Plaintiff's second theory of liability is that Defendant breached its duty of prudence by using forfeited funds for its own benefit rather than for the benefit of the Plan [ECF No. 27 ¶¶ 31–39, 145]. Though styled as a one-count action, the forfeiture allegations are separate and independent from the recordkeeping allegations discussed above. The Court turns to the forfeiture allegations now.

As previewed, under the Plan, matching contributions vest over time. If a Plan participant leaves the company before a matching contribution fully vests, the participant forfeits that unvested balance [ECF No. 27 ¶¶ 5–6]. In that circumstance, the Plan Document sets forth how forfeitures are to be used by Nextera [ECF No. 27 ¶ 8]. Plaintiff alleges that "Nextera breached its fiduciary duties to the Plan by failing to follow the terms of the Plan document with respect to forfeitures" [ECF No. 27 ¶ 8]. The Court accordingly starts with the provision in the Plan that governs forfeitures.

Section 5.05 of the Plan Document, titled "Allocation of Forfeitures," provides as follows:

> Forfeitures shall first be applied to restore to Participants amounts previously forfeited pursuant to Section 5.03. Any remaining forfeitures shall be applied to reduce Plan administrative expenses and, if none, any remaining forfeitures shall be used to reduce Company Contributions.

[ECF No. 32-2 p. 45]. In other words, as the parties agree, the Plan sets forth a mandatory priority for how forfeitures are to be allocated: ***first***, to restore previously forfeited amounts pursuant to Section 5.03 (not relevant here);[14] ***second***, to "reduce Plan administrative expenses"; and ***third***, any remaining funds are used to reduce Company Contributions.

---

[14] Section 5.03 addresses a situation where an employee leaves the company with unvested funds and then returns to the company.

Plaintiff alleges that, contrary to this mandatory hierarchy, Defendant wrongfully used forfeitures to reduce company contributions (step 3) before paying all Plan administrative expenses (step 2) [ECF No. 27 ¶ 35].  Plaintiff alleges that, "[a]t all relevant times, the Plan's administrative expenses exceeded the annual forfeitures," and that Plan participants have incurred deductions to their accounts to cover Plan expenses [ECF No. 27 ¶¶ 34, 37].  So, in Plaintiff's view, there were never any forfeiture funds left over to reduce company contributions (i.e., the recordkeeping costs deducted from participants' accounts should have been offset at step two before going toward company contributions in step three).  But as Plaintiff emphasizes, Defendant's disclosures admit that, over the Class Period, Defendant used over $13 million to reduce company contributions [ECF No. 27 ¶¶ 31–36].  Plaintiff alleges that by using forfeitures in this manner, Defendant violated the plain terms of the Plan and breached its duty of prudence [ECF No. 27 ¶¶ 145].

Defendant offers a competing view, urging that "Section 5.05 of the Plan Document does not provide for the allocation of forfeited funds to pay per-participant recordkeeping fees" [ECF No. 50 p. 5].  According to Defendant, "Plan administrative expenses" as used at step 2 in Section 5.05 include items such as "auditor fees and consultant fees"—not pay per-participant recordkeeping fees, which Defendant says are "allocated to Plan participants" [ECF No. 50 p. 5].  In short, the parties disagree as to whether the recordkeeping expenses discussed above that are deducted from Plan participants' accounts qualify as "Plan administrative expenses" under Section 5.05 such that forfeitures must be used to cover those expenses before they can be used to offset company contributions.

The term "Plan administrative expenses" is not defined in the Plan.  According to Defendant, the term means "costs of administering the Plan that are not expressly allocated to Plan participants" [ECF No. 50 p. 7].  In support of this interpretation, Defendant offers a rather

13

convoluted explanation that relies on two other provisions of the Plan. The first is Section 10.02, titled "Plan Expenses," which is reproduced in full below:

> The principal or income of the Trust Fund shall not be used for any purpose whatsoever other than for the exclusive benefit of Participants or their respective Beneficiaries or to meet the necessary expenses of the Plan. The Trustee shall pay from Trust assets all expenses reasonably incurred in the administration of the Plan, unless at the discretion of the Company, such expenses are paid by the Company or any Employer or Employers. Brokerage fees, commissions, taxes (other than transfer taxes on distribution of shares of Common Stock) and expenses incident to the income or assets of the Trust or the purchase or sale of securities by the Trustee, which have been allocated to the Plan, shall be deducted in computing the proceeds therefrom. The Company may request reimbursement from the Trust for certain expenses, including compensation expenses, incurred by the Company solely in its provision of services for the Plan. Any such reimbursement shall be made only to the extent permitted by ERISA.

[ECF No. 32-2 p. 60]. The second provision on which Defendant relies is Section 10.03, titled "Fees Charged to Participants," which too is quoted below in full:

> An annual administration fee may be charged to the Account of each Participant or Beneficiary. The annual administration fee shall be allocated among Participants in any manner reasonably determined by EBPIC, provided that the administration fee shall be waived for Eligible Employees whose account balance is less than $5,000 or such other amount as determined by EBPIC in its sole discretion. A loan administration fee shall be charged to the Accounts of a Participant who has been granted a loan. The loan administration fee shall be charged proportionately to each of the Participant's Accounts, and within such Accounts, ratably to each investment option elected.
>
> In addition, fees to determine the qualified status of a domestic relations order described in Code Section 414(p) ("QDRO Administration Fee") shall be proportionately charged to the Accounts of the affected Participant, ratably among each investment option elected. Notwithstanding the foregoing, QDRO Administration Fees shall not be charged to Accounts of FPL Bargaining Participants, NextEra Duane Arnold Bargaining Participants represented by IBEW 204, and NextEra Seabrook Bargaining Participants.

[ECF No. 32-2 p. 60].

Relying on these two provisions, Defendant argues that, "[i]f recordkeeping fees charged directly to participant accounts were intended to be addressed by Section 10.02, then Section 10.02 would direct the Trustee 'to pay [them] in full'" [ECF No. 50 p. 9 (quoting Committee appeal

denial decision)]. Moreover, Defendant argues that if recordkeeping charges were covered by Section 10.02, such an "interpretation would create a conflict between Section 10.02 and Section 10.03, which states that certain fees 'may be charged' to participant accounts" [ECF No. 50 p. 9]. As best the Court can discern from these confusing arguments, it appears Defendant's position is that recordkeeping expenses incurred by the Plan somehow escape the category of "Plan administrative expenses" in Section 5.05 (step 2), because Sections 10.02 and 10.03 differentiate between Plan Expenses and Fees Charged to Participants in a way that "inform[s]" Section 5.05 and thus authorizes the Committee's decision to use forfeited funds to reduce company contributions before using them to offset the recordkeeping expenses charged to plan participants [*see* ECF No. 50 p. 8].

Upon review of Defendant's arguments regarding the forfeiture allegations, the Court is not convinced that dismissal is warranted. For starters, though Defendant correctly observes that Section 10.03 contemplates Plan participants paying an administrative fee, it remains unclear why that fact would compel the conclusion that "Plan administrative expenses" does not include the recordkeeping expenses that were deducted from participants' individual accounts. In other words, Section 10.03 and Section 5.05 are not mutually exclusive; Section 10.03 can authorize fees charged to participants, and Section 5.05 can mandate that forfeitures are used to offset those fees before the funds are used toward company contributions. At the very least, by asking the Court to defer to the Committee's interpretation of Section 5.05, Defendant essentially admits that the term "Plan administrative expenses" is susceptible to multiple reasonable interpretations [ECF No. 50 pp. 12–13]. Accordingly, Defendant's reliance on cases where the "unambiguous" and "mandatory" language of the plan document ran counter to the plaintiff's proposal for the forfeitures does not move the needle [ECF No. 50 pp. 6, 11 (citing *Naylor v. BAE Sys., Inc.*, No.

1:24-CV-00536 (AJT/WEF), 2024 WL 4112322 at *6 (E.D. Va. Sept. 5, 2024)]. Simply put, it is far from clear that the Court is dealing with a situation where the "only reasonable interpretation" of the Plan is the interpretation advanced by Defendant [ECF No. 50 p. 10 (quoting *Wright v. JPMorgan Chase & Co*, 2025 WL 1683642, at *4 (C.D. Cal. June 13, 2025)]. And it is also unclear, as posited by Defendant, that reading "Plan administrative expenses" in Section 5.05 without the additional qualifier/restrictor added by Defendant [*see* ECF No. 50 p. 7 (limiting "Plan administrative expenses" to "Plan administrative expenses" that are "not expressly allocated to Plan participants")] would render superfluous the reference in Section 10.03 authorizing the Committee to charge plan participants an administrative fee.[15]

Finally, although Defendant is quick to point out that the Plan gives the Committee full discretionary authority "to construe and interpret the Plan," it is at least plausible that, in exercising that discretion given the language of the Plan, Defendant breached its duty of prudence by unreasonably interpreting Section 5.05 to exclude recordkeeping expenses from "Plan administrative expenses." Compliance with a plan document does not necessarily mean a fiduciary has discharged its duties with the prudence required under ERISA. *See Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 421 (2014). Plaintiff's forfeiture claim may proceed to discovery.

---

[15] At this stage at least, the Court will not simply defer to the Committee's interpretation and dismiss Plaintiff's forfeiture theory as Defendant requests. Although Defendant is correct that "[t]rust principles make a deferential standard of review appropriate when a trustee exercises discretionary powers" under an ERISA benefits plan, *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111 (1989), the Eleventh Circuit has not weighed in on whether this deferential standard applies to breach-of-fiduciary-duty cases. *See Huang v. TriNet HR III, Inc.*, No. 8:20-CV-2293-VMC-TGW, 2022 WL 93571 at *3–4 (M.D. Fla. Jan. 10, 2022) (discussing split in other circuits). As far as cases in this circuit go, Defendant has not identified any breach-of-fiduciary-duty ERISA case where a court dismissed a claim at the pleading stage based solely on deference to the Committee's interpretation. *See id*. Defendant can re-raise this argument at summary judgment if it wishes to do so.

***

To summarize, the Complaint sets forth plausible allegations that Defendant breached its duty of prudence by failing to monitor and control the Plan's recordkeeping costs, and also by misusing forfeitures to the detriment of the Plan. The Court expresses no view on the ultimate merits of these allegations and has no occasion to address in this Order Plaintiff's additional theories regarding indirect compensation. *Supra* p. 11 nn.12–13.

## CONCLUSION

For these reasons, it is **ORDERED** and **ADJUDGED** as follows:

1. Defendant's Motion to Dismiss [ECF No. 32] is **DENIED**.

2. On or before **August 28, 2025**, Defendant shall file an answer to Plaintiff's First Amended Complaint [ECF No. 27].

**ORDERED** in Chambers at Fort Pierce, Florida, this 14th day of August 2025.

_____
AILEEN M. CANNON
UNITED STATES DISTRICT JUDGE

cc:  counsel of record